UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

NICOLE HALL, as Admin. of the Estate of Amir Hall,

                    Plaintiff,

v.

NYS DEP'T OF CORR. AND CMTY. SUPERV.; NYS OFFICE
OF MENTAL HEALTH; BRIAN FISCHER, Comm'r of NYS
DOCCS; DR. MICHAEL  F. HOGAN, Comm'r of NYS OMH;
DANIEL J. KANE, Sgt., Mid-State C.F.; JOHN P. DISCHIAVO,
Lt., Mid-State C.F.; DAVID A. BUCKBEE, Corr. Officer,
Mid-State C.F.; ROY JOHNSON, Corr. Officer, Mid-State C.F.;
PAUL E. LASHWAY, Corr. Officer, Mid-State C.F.; ROBERT T.
EVANS, Corr. Officer, Mid-State C.F.; MICHAEL P. HUSNAY,
Corr. Officer, Mid-State C.F.; JAMES R. TEDESCO, Corr. Officer,
Mid-State C.F.; JOSEPH P. NORWICH, Corr. Officer, Mid-State
C.F.; CHARLES KELLY, Superint., Great Meadow C.F.;
WILLIAM F. HULIHAN,  Superint., Mid-State C.F.; LEWIS
RICHARD DAVIS, Soc. Worker, OMH; LYUBOV SAVITSKIY,
Nurse, Mid-State C.F.; ZOE KINGSLEY, Nurse, Great Meadow
C.F.; J. KILBURN, Sgt., Great Meadow C.F.; DR. SARAH
NELSON, Psychiatrist, OMH; YOLANDA PERONI, Soc.
Worker, OMH; MARILYN STEMEN, Nurse Practitioner, OMH;
NICOLE HUNTER, Soc. Worker, OMH; KELLY DEHIMER,
Nurse Supervisor, OMH; JULIE HUTCHINSON, Nurse, OMH;
DOWNSTATE C.F. JANE AND JOHN DOES #1-10; DR.
ROBERT BAKALL, Physician, OMH; SHANNAN SULLIVAN,
Psychology Assist., OMH; DR. LAWRENCE FARAGO,
Physician, OMH; JILL PORTER, Licensed Master Soc. Worker,
OMH; KAREN TORTELET, Psychiatric Nurse Practitioner, OMH;
LORI CUNNINGHAM, Licensed Master Soc. Worker, OMH;
MID-STATE C.F. MED. STAFF JANE AND JOHN DOES #1-10;
DeRIDER, Lt., Mid-State C.F.; DUBERNECKI, Lt., Mid-State C.F.;
D.S.S. WARD, Hearing Officer, Mid-State C.F.; CHRISTOPHER J.
HOLMER, Capt., Mid-State C.F.; MID-STATE C.F. JANE AND
JOHN DOES #1-10; DR. DANIELLE DILL-LEWIS, Physician,
OMH; GREAT MEADOW C.F. JANE AND JOHN DOES #1-10,

                    Defendants.

_____

9:12-CV-0377
(GTS/DEP)

APPEARANCES:                                          OF COUNSEL:

STROOCK & STROOCK & LAVAN LLP                         JAMES L. BERNARD, ESQ.
   Counsel for Plaintiff                              PATRICK N. PETROCELLI, ESQ.
180 Maiden Lane
New York, NY 10038

HON. ERIC T. SCHNEIDERMAN                             TIMOTHY P. MULVEY, ESQ.
   Counsel for All Defendants Except                  Assistant Attorney General
   Lewis Richard Davis and Zoe Kingsley
615 Erie Boulevard West, Suite 102
Syracuse, NY 13204-2455

LaMARCHE SAFRANKO LAW PLLC                            GEORGE E. LaMARCHE, ESQ.
   Counsel for Defendant Lewis Richard Davis          MARC R. PALLOZZI, ESQ.
1539 Crescent Road
P.O. Box 5437
Clifton Park, NY 12065

LAW OFFICE OF ROBERT M. WINN                          ROBERT M. WINN, ESQ.
   Counsel for Defendant Zoe Kingsley
13 North Street
Granville, NY 12832

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently before the Court, in his prisoner civil rights action filed by Nicole Hall as the

Administratrix of the Estate of Amir Hall ("Plaintiff") against the 76 above-captioned New York

State employees and agencies, are the following five motions: (1) a motion to dismiss the Third

and Fourth Claims of Plaintiff's Amended Complaint for failure to state a claim upon which

relief can be granted, filed by all individually named Defendants except Lewis Richard Davis and

Zoe Kingsley ("the AG Defendants"); (2) Defendant Kingsley's motion for summary judgment;

(3) Defendant Davis' motion for summary judgment; (4) Plaintiff's motion *in limine* to partially

exclude the expert testimony relied on by AG Defendants in their motion for partial summary

judgment; and (5) the AG Defendants' motion for partial summary judgment. (Dkt. Nos. 85, 130, 132, 134, 146.) For the reasons set forth below, the AG Defendants' motion to dismiss is granted; Defendant Kingsley's motion for summary judgment is granted; Defendant Davis' motion for summary judgment is granted; Plaintiff's motion *in limine* is granted; and the AG Defendants' motion for partial summary judgment is granted in part and denied in part.

# TABLE OF CONTENTS

I.     **PLAINTIFF'S CLAIMS**........................................................................................5

II.    **LEGAL STANDARDS GOVERNING DEFENDANTS' MOTIONS**.....................8

    A.    **Motion for Judgment on the Pleadings**...............................................8

    B.    **Motion for Summary Judgment**..........................................................10

III.    **ANALYSIS**.............................................................................................................10

    A.    **The AG Defendants' Motion to Dismiss for Failure to State a Claim**...............10

        1.    **Parties' Briefing on the AG Defendants' Motion to Dismiss**...................10

        2.    **Ruling on the AG Defendants' Motion to Dismiss**......................13

    B.    **Defendant Kingsley's Motion for Summary Judgment**.....................19

        1.    **Parties' Briefing on Defendant Kingsley's Motion**.....................19

        2.    **Ruling on Defendant Kingsley's Motion**...................................21

    C.    **Defendant Davis' Motion for Summary Judgment**...........................27

        1.    **Parties' Briefing on Defendant Davis' Motion**.........................27

        2.    **Ruling on Defendant Davis' Motion**........................................30

    D.    **Plaintiff's Motion *in Limine* to Partially Exclude the Expert Testimony Relied on by the AG Defendants in Their Motion for Partial  Summary Judgment**........................................................................................38

        1.    **Parties' Briefing on Plaintiff's Motion *in Limine***....................38

        2.    **Ruling on Plaintiff's Motion *in Limine***...................................39

    E.    **The AG Defendants' Motion for Partial Summary Judgment**...........40

        1.    **Parties' Briefing on the AG Defendants' Motion for Partial Summary Judgment**.......................................................40

        2.    **Ruling on the AG Defendants' Motion for Partial Summary Judgment**......................................................................42

            a.    **The AG Defendants' First Argument**.........................42

                i.    **Nelson**..........................................................42

                ii.    **Peroni**..........................................................42

                 iii.    **Hunter**.........................................................44

                 iv.    **Hutchinson and Dehimer**...........................44

                 v.    **Stemen**.........................................................45

                 vi.    **Sullivan**.......................................................46

                 vii.    **Bakall**..........................................................48

                 viii.    **Cunningham**...............................................49

                 ix.    **Porter, Tourtelot and Farago**.....................51

                 x.    **DeRider, Wiernicki, Holmer and Ward**.....56

                 xi.    **Extraction Team**.........................................60

                 xii.    **Kilburn**.......................................................63

                 xiii.    **John and Jane Does**....................................65

            b.    **The AG Defendants' Second Argument**.....................65

            c.    **The AG Defendants' Third Argument**.......................68

            d.    **The AG Defendants' Fourth Argument**.....................68

# I.     PLAINTIFF'S CLAIMS

Generally, Plaintiff's Amended Complaint alleges that, between August 31, 2009, and June 20, 2010, Defendants were deliberately indifferent to Amir Hall's serious medical needs, discriminated against him based on his mental illness, and neglected their duties while he was a patient of the CNY Psychiatric Center in the New York State Office of Mental Health ("OMH"), and was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), resulting in his suicide on June 20, 2012.  (Dkt. No. 38 [Plf.'s Am. Compl.].)

More specifically, the Amended Complaint alleges that, during this period, Amir received a series of diagnoses and transfers: (1) a transfer from the Albany County Jail to the CNY Psychiatric Center on August 31, 2009, so that he could receive mental health treatment; (2) a transfer from the CNY Psychiatric Center to Downstate Correctional Facility ("C.F.") on November 3, 2009, with a diagnosis of Major Depressive Disorder and a recommendation that he participate in a Transitional Intermediate Care Program ("TrICP"); (3) a transfer from Downstate C.F. to Mid-State C.F. on December 10, 2009, with a diagnosis first of Polysubstance Dependence and Borderline Personality Disorder (bearing a Mental Health Service Level or "MHSL" of 1), then of Adjustment Disorder, Alcohol Dependence, Cannabis Dependence, and Personality Disorder Not Otherwise Specified (also bearing a MHSL of 1), and an intent that he participate in a Sex Offender Treatment Program ("SOTP") and Aggression Replacement Training Program ("ARTP") there; (4) a transfer from Mid-State C.F.'s general population to its Residential Crisis Treatment Program ("RCTP") on January 2, 2010, so that his suicidal ideation could be treated; (5) a transfer from the RCTP back to Mid-State C.F.'s general population at

some subsequent point in January 2010; (6) a transfer from Mid-State C.F.'s general population to its Special Housing Unit ("SHU") on February 17, 2010, where he served successive disciplinary sentences over the next four months (i.e., 21 days starting on February 17, 2010, 30 days starting on March 12, 2010, 43 days starting on April 20, 2010, and seven months starting on June 9, 2010), with his diagnosis changed on April 8, 2010, to Polysubstance Dependence and Borderline Personality Disorder (bearing a MHSL of 1), and downgraded on June 4, 2010, to MHSL 2, due to a purported lack of symptoms supporting a major mental health diagnosis; and (7) a transfer from Mid-State C.F.'s SHU to Great Meadow C.F.'s SHU on June 18, 2010, to complete the seven-month SHU sentence. (*Id.*)

Generally, based on these factual allegations, Plaintiff's Amended Complaint asserts the following ten claims against Defendants: (1) a claim of deliberate indifference to Amir's serious medical needs under the Eighth Amendment, asserted against approximately 49 doctors, nurses, social workers, and correctional employees;[1] (2) a claim of deliberate indifference to his serious medical needs under the Eighth Amendment, asserted against four supervisory officials;[2] (3) a

_____

[1]     Specifically, this claim is asserted against Dr. Sarah Nelson, Social Worker Yolanda Peroni, Nurse Practitioner Marilyn Stemen, Social Worker Nicole Hunter, Nurse Supervisor Kelly DeHimer, Nurse Julie Hutchinson, the Downstate C.F. Jane and John Does #1-10, Dr. Robert Bakall, Psychology Assistant Shannan Sullivan, Dr. Lawrence Farago, Licensed Master Social Worker Jill Porter, Psychiatric Nurse Practitioner Karen Tortelet, Licensed Master Social Worker Lori Cunningham, Lieutenant DeRider, Lieutenant Dubernecki, Hearing Officer D.S.S. Ward, Captain Christopher J. Holmer, Mid-State C.F. Jane and John Does #1-10, Social Worker Lewis Richard Davis, Sergeant Daniel J. Kane, Lieutenant John P. Dischiavo, Corrections Officer David A. Buckbee, Corrections Officer Roy Johnson, Corrections Officer Paul E. Lashway, Corrections Officer Robert T. Evans, Corrections Officer Michael P. Husnay, Corrections Officer James R. Tedesco, Corrections Officer Joseph P. Norwich, Nurse Lyubov Savitskiy, Nurse Zoe Kingsley, and Sergeant J. Kilburn.

[2]     Specifically, this claim is asserted against DOCCS Commissioner Brian Fischer, OMH Commissioner Michael F. Hogan, Mid-State C.F. Superintendent William Hulihan, and

claim of violation of Title II of the Americans with Disabilities Act of 1990 ("ADA"), asserted against approximately 49 agencies, doctors, nurses, social workers, and correctional employees;[3] (4) a claim of violation of Section 504 of the Rehabilitation Act of 1973 ("the Rehabilitation Act"), also asserted against approximately 49 agencies, doctors, nurses, social workers, and correctional employees;[4] (5) a claim of negligence under New York State common law, asserted against approximately 25 doctors, nurses and social workers;[5] (6) a claim of ministerial neglect under New York State common law, asserted against approximately 22 doctors, nurses and social workers;[6] (7) a claim of medical malpractice under New York State common law, asserted

---

Great Meadow C.F. Superintendent Charles Kelly.

[3]      Specifically, this claim is asserted against DOCCS, OMH, Dr. Sarah Nelson, Social Worker Yolanda Peroni, Nurse Practitioner Marilyn Stemen, Social Worker Nicole Hunter, Nurse Supervisor Kelly DeHimer, Nurse Julie Hutchinson, Downstate C.F. Jane and John Does #1-10, Dr. Robert Bakall, Psychology Assistant Shannan Sullivan, Lieutenant DeRider, Lieutenant Dubernecki, Hearing Officer D.S.S. Ward, Captain Christopher J. Holmer, Mid-State C.F. Jane and John Does #1-10, Dr. Lawrence Farago, Licensed Master Social Worker Jill Porter, Psychiatric Nurse Practitioner Karen Tortelet, Licensed Master Social Worker Lori Cunningham, Great Meadow C.F. Jane and John Does #1-10, and Dr. Danielle Dill-Lewis.

[4]      *See, supra,* note 3 of this Decision and Order.

[5]      Specifically, this claim is asserted against Dr. Sarah Nelson, Social Worker Yolanda Peroni, Nurse Practitioner Marilyn Stemen, Social Worker Nicole Hunter, Nurse Supervisor Kelly DeHimer, Nurse Julie Hutchinson, Dr. Robert Bakall, Psychology Assistant Shannan Sullivan, Dr. Lawrence Farago, Licensed Master Social Worker Jill Porter, Psychiatric Nurse Practitioner Karen Tortelet, Licensed Master Social Worker Lori Cunningham, Social Worker Lewis Richard Davis, Mid-State C.F. Medical Staff Jane and John Does #1-10, Nurse Zoe Kingsley, and Dr. Danielle Dill-Lewis.

[6]      Specifically, this claim is asserted against Dr. Sarah Nelson, Social Worker Yolanda Peroni, Nurse Practitioner Marilyn Stemen, Social Worker Nicole Hunter, Nurse Supervisor Kelly DeHimer, Nurse Julie Hutchinson, Dr. Lawrence Farago, Licensed Master Social Worker Jill Porter, Psychiatric Nurse Practitioner Karen Tortelet, Licensed Master Social Worker Lori Cunningham, Social Worker Lewis Richard Davis, Mid-State C.F. Medical Staff Jane and John Does #1-10, and Nurse Zoe Kingsley.

against approximately 23 doctors, nurses and social workers;[7] (8) a claim of wrongful death

under New York State common law, asserted against approximately 25 doctors, nurses and social

workers;[8] (9) a claim of violation of the New York State Constitution, asserted against 14

doctors, nurses and social workers;[9] and (10) a claim of violation of the New York State

Constitution, asserted against four supervisory officials.[10]  (*Id.*)

## II.  LEGAL STANDARDS GOVERNING DEFENDANTS' MOTIONS

### A.  Motion for Judgment on the Pleadings

Although the AG Defendants' label their motion as one to dismiss for failure to state a

claim under Fed. R. Civ. P. 12(b)(6), it is actually one for judgment on the pleadings under Fed.

---

[7]    Specifically, this claim is asserted against Dr. Sarah Nelson, Social Worker Yolanda Peroni, Nurse Practitioner Marilyn Stemen, Social Worker Nicole Hunter, Nurse Supervisor Kelly DeHimer, Nurse Julie Hutchinson, Dr. Robert Bakall, Psychology Assistant Shannan Sullivan, Dr. Lawrence Farago, Licensed Master Social Worker Jill Porter, Psychiatric Nurse Practitioner Karen Tortelet, Licensed Master Social Worker Lori Cunningham, Mid-State C.F. Medical Staff Jane and John Does #1-10, and Dr. Danielle Dill-Lewis.

[8]    Specifically, this claim is asserted against Dr. Sarah Nelson, Social Worker Yolanda Peroni, Nurse Practitioner Marilyn Stemen, Social Worker Nicole Hunter, Nurse Supervisor Kelly DeHimer, Nurse Julie Hutchinson, Dr. Robert Bakall, Psychology Assistant Shannan Sullivan, Dr. Lawrence Farago, Licensed Master Social Worker Jill Porter, Psychiatric Nurse Practitioner Karen Tortelet, Licensed Master Social Worker Lori Cunningham, Mid-State C.F. Medical Staff Jane and John Does #1-10, Social Worker Lewis Richard Davis, Nurse Zoe Kingsley, and Dr. Danielle Dill-Lewis.

[9]    Specifically, this claim is asserted against Dr. Sarah Nelson, Social Worker Yolanda Peroni, Nurse Practitioner Marilyn Stemen, Social Worker Nicole Hunter, Nurse Supervisor Kelly DeHimer, Nurse Julie Hutchinson, Dr. Robert Bakall, Psychology Assistant Shannan Sullivan, Dr. Lawrence Farago, Licensed Master Social Worker Jill Porter, Psychiatric Nurse Practitioner Karen Tortelet, Licensed Master Social Worker Lori Cunningham, Social Worker Lewis Richard Davis, and Nurse Zoe Kingsley.

[10]    Specifically, this claim is asserted against DOCCS Commissioner Brian Fischer, OMH Commissioner Michael F. Hogan, Mid-State C.F. Superintendent William Hulihan, and Great Meadow C.F. Superintendent Charles Kelly.

R. Civ. P. 12(c) because an Answer had already been filed by them.  (Dkt. No. 62.)  In any event, the legal standards governing the motions are the same.  *See Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) ("The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim.") (collecting cases).  As a result, for the sake of consistency, the Court will refer to the AG Defendants' motion for judgment on the pleadings as a "motion to dismiss."

Because this Decision and Order is intended primarily for the review of the parties, and counsel have demonstrated (in their memoranda of law) an adequate understanding of the well-known legal standard governing a motion to dismiss for failure to state a claim, the Court will not recite that legal standard in its totality in this Decision and Order, but will merely direct the reader to the Court's decision in *F.M. ex rel. Ms. M. v. Anderson Center for Autism*, 13-CV-0041, 2014 WL 4457256, at *7-9 (N.D.N.Y. Sept. 10, 2014) (Suddaby, J.), which accurately recites that legal standard.

In addition, the Court will briefly recite the standard governing what documents are considered when a dismissal for failure to state a claim is contemplated.  Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual

background of the case.[11]

**B.     Motion for Summary Judgment**

Again, because this Decision and Order is intended primarily for the review of the parties,

and counsel have demonstrated (in their memoranda of law) an adequate understanding of the

well-known legal standard governing a motion for summary judgment, the Court will not recite

that legal standard in its totality in this Decision and Order, but will merely direct the reader to

the Court's decision in *Lenigan v. Syracuse Hancock Int'l Airport*, 10-CV-1420, 2013 WL

149461, at *4-5 (N.D.N.Y. Jan. 14, 2013) (Suddaby, J.), which accurately recites that legal

standard.

**III.     ANALYSIS**

**A.     The AG Defendants' Motion to Dismiss for Failure to State a Claim**

**1.     Parties' Briefing on the AG Defendants' Motion to Dismiss**

Generally, in their motion to dismiss the Third and Fourth Claims of Plaintiff's Amended

Complaint for failure to state a claim (i.e., her claims arising under the ADA and the

Rehabilitation Act), the AG Defendants argue as follows: (1) the legal standards governing

Plaintiff's claims under the ADA and the Rehabilitation Act are the same; (2) under the legal

standard that governs both of those claims, Plaintiff's Amended Complaint fails to allege facts

plausibly suggesting the third element of such claims (i.e., that Amir was denied the opportunity

to participate in, or benefit from, the AG Defendants' services, programs, or activities, or was

otherwise discriminated against by the AG Defendants, by reason of his disability), because,

_____

[11]     *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit
to a pleading is a part thereof for all purposes."); *Knight v. Fed. Nat. Mortg. Ass'n*, 13-CV-0183,
2014 WL 4901617, at *10, n.3 (N.D.N.Y. Sept. 30, 2014) (Suddaby, J.) (collecting cases).

while Plaintiff's allegations challenge the adequacy of the mental health treatment that Amir received, they do not allege facts plausibly suggesting any discriminatory conduct based on his disability (most notably, that he was treated any differently than were inmates who are not mentally disabled); and (3) at the very least, to the extent that Plaintiff asserts a claim for money damages against any state officials in their official capacities under either the ADA or Rehabilitation Act (for example, as expressly stated in Paragraphs 203 and 216 of the Amended Complaint), those claims are barred by the doctrine of sovereign immunity. (Dkt. No. 85, Attach. 1.)

Generally, in response, Plaintiff argues as follows: (1) although Plaintiff expressly bases both of her discrimination claims on each of the three separate theories on which she can do so–i.e., disparate treatment, disparate impact, and failure to make reasonable accommodation–the AG Defendants have focused on only the first of those three theories, neglecting to address the other two; (2) as an initial matter, the AG Defendants' argument regarding Plaintiff's reliance on the disparate-treatment theory should be rejected because she has sufficiently alleged discrimination because of Amir's disability (for example, in Paragraphs 69, 79 and 108 of the Amended Complaint); (3) in any event, Plaintiff's discrimination claims survive under a disparate-impact theory because she has sufficiently alleged that DOCCS has a facially neutral policy of using solitary confinement in a punitive manner to punish misbehavior, and a practice of not offering certain programs to inmates who are receiving inpatient psychiatric services (as alleged in Paragraphs 164 to 172 of the Amended Complaint); (4) in any event, Plaintiff's discrimination claims survive under a failure-to-make-reasonable-accommodations theory because she has alleged that, despite Amir's request, he was denied access to certain programs

and services (such the SOTP, ARTP or TrICP) while he was confined in SHU (as alleged in Paragraphs 71, 77 and 108 of the Amended Complaint and as indicated in four exhibits to Attorney Petrocelli's Declaration); (5) because, in opposing the AG Defendants' motion to dismiss, Plaintiff has relied on facts and other information "outside the pleadings," the Court should convert the AG Defendants' motion to dismiss to one for summary judgment and deny it; and (6) in the event the Court grants the AG Defendants' motion to dismiss, it should grant Plaintiff leave to file a Second Amended Complaint. (Dkt. No. 96.)

Generally, in reply, the AG Defendants argue as follows: (1) contrary to Plaintiff's argument, the paragraphs of her Amended Complaint that she relies on do not allege facts plausibly suggesting discrimination based on disability but allege merely an inadequate level of mental health care; (2) with regard to Plaintiff's reliance on the disparate-impact theory of liability and the failure-to-make-reasonable-accommodation theory of liability, (a) she does not allege facts plausibly suggesting that Amir could have participated in any DOCCS program while he was a patient at the CNY Psychiatric Center, (b) she does not allege facts plausibly suggesting that he was a convicted sex offender sufficient to qualify for the SOTP (or that non-mentally ill inmates at Mid-State C.F., who were not convicted sex offenders, were enrolled in the SOTP), and (c) she disregards the fact that he effectively excluded himself from access to any inmate programs (including the SOTP) by incurring disciplinary penalties within a month of arriving at Mid-State C.F., as alleged in the Amended Complaint; (3) the Court should not accept Plaintiff's evidentiary submissions or convert the AG Defendants' motion to dismiss to one for summary judgment, because (a) if viewed in a light most favorable to Plaintiff, they do not establish a prima facie case of ADA discrimination by Defendants against Amir, and (b) in any event,

Plaintiff has not filed a Statement of Material Facts as required by Local Rule 7.1(a)(3) of the Local Rules of Practice for this District; and (4) finally, Plaintiff should not be granted leave to amend her operative pleading yet again, because doing so would be futile.  (Dkt. No. 112.)

## 2. Ruling on the AG Defendants' Motion to Dismiss

After carefully considering the matter, the Court grants this motion for the reasons stated in the AG Defendants' memoranda of law.  *See, supra,* Part III.A.1. of this Decision and Order. To those reasons, the Court adds the following analysis.

Regarding Plaintiff's disparate-treatment theory of liability, the Court rejects that theory on the additional ground that the Amended Complaint alleges only conclusorily that Defendants treated Amir differently than they treated others similarly situated because of his mental illness. For example, of the 49 Defendants against whom this claim is asserted, 14 are mental health care professionals,[12] 30 of the other 35 officials being John or Jane Doe Defendants (against whom scant, if any, factual allegations are asserted).[13] With regard to the 14 mental health care professionals, it appears implausible to the Court that those mental health professionals, whose job it was to care for mentally ill patients such as Plaintiff, intentionally discriminated against

---

[12]     Specifically, these 14 mental health care providers are as follows: OMH, Dr. Sarah Nelson, Social Worker Yolanda Peroni, Nurse Practitioner Marilyn Stemen, Social Worker Nicole Hunter, Nurse Supervisor Kelly DeHimer, Nurse Julie Hutchinson, Dr. Robert Bakall, Psychology Assistant Shannan Sullivan, Dr. Lawrence Farago, Licensed Master Social Worker Jill Porter, Psychiatric Nurse Practitioner Karen Tortelet, Licensed Master Social Worker Lori Cunningham, and Dr. Danielle Dill-Lewis.

[13]     Specifically, these 30 John and Jane Doe Defendants are as follows: Downstate C.F. Jane and John Does #1-10, Mid-State C.F. Jane and John Does #1-10, and Great Meadow C.F. Jane and John Does #1-10.

him based on his mental illness.[14]

Moreover, with regard to all 49 of these Defendants, the Court notes that Paragraphs 69, 79 of 108 of the Amended Complaint are based merely on "information and belief." (Dkt. No. 38, at ¶¶ 69, 79, 108 [Plf.'s Am. Compl].) Granted, such allegations may suffice "where [1] the facts are peculiarly within the possession and control of the defendant or [2] where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir.2010) (internal quotation marks omitted). However, here, Plaintiff has identified no barrier that would prevent her from obtaining the identify (or even a description) of any of the other individuals to whom she compares Amir. *See, e.g., Installed Bldg. Prods., LLC v. Cottrell*, 13-CV-1112, 2014 WL 3729369, at *4 (W.D.N.Y. July 25, 2014) ("The Plaintiff has identified no barrier that would prevent it from simply asking the customers or employees it alleges Cottrell has solicited whether Cottrell has, in fact, solicited them.").[15] As a result, Plaintiff's "information and belief" allegations will suffice only if the belief is based on factual information that makes the inference of culpability plausible. However, here, the "factual information" relied on by Plaintiff is not alleged. (Dkt. No. 38, at ¶¶ 69, 79,

---

[14] The Court notes that, if Plaintiff is alleging that mental health professionals treated other mentally ill individuals differently than they treated Amir based on a different mental illness, those facts are not alleged in the Amended Complaint. Moreover, if Plaintiff is alleging that it is *non*-mentally ill individuals who are similarly situated to Amir, then she has not alleged facts plausibly suggesting that Defendant mental health care professionals *treated* such individuals at all.

[15] The Court notes that, at the time she filed this action on February 29, 2012, Plaintiff was represented by counsel. (Dkt. No. 1.) The Court notes also that, setting aside whatever information is available to her counsel through the New York State Freedom of Information Law, discovery in this action had been ongoing for nearly five months by the time Plaintiff filed her Amended Complaint on November 1, 2012. (Dkt. No. 29 [Uniform Pretrial Scheduling Order, filed June 6, 2012]; Dkt. No. 38 [Plf.'s Am. Compl., filed Nov. 1, 2012].)

108 [Plf.'s Am. Compl.].) This remains the case even when the Court considers the 307 pages of

exhibits attached to Plaintiff's Amended Complaint. (Dkt. No. 38, Attach. 1-8.) Simply stated,

this theory of liability is vague, speculative and conclusory. *See, e.g., JBCHoldings NY, LLC v.*

*Pakter*, 931 F. Supp.2d 514, 526-27 (S.D.N.Y. 2013).

Regarding Plaintiff's disparate-impact theory of liability, the Court rejects that theory on

each of two grounds: (1) as an initial matter, the Amended Complaint fails to allege facts

plausibly suggesting the existence of any policy whatsoever; and (2) in any event, the Amended

Complaint fails to allege facts plausibly suggesting that any such policy imposed a significantly

adverse or disproportionate impact on a protected group of individuals. The Court notes that,

with regard to Amir's treatment in the CNY Psychiatric Center, Plaintiff does not allege facts

plausibly suggesting that other mental health patients were treated differently than was Amir

based on their particular mental illness, or that Amir could have even participated in any DOCCS

program or service while he was a patient at the CNY Psychiatric Center.[16] With regard to

Amir's treatment in DOCCS, Plaintiff does not allege facts plausibly suggesting that other

---

[16]     To the extent Plaintiff alleges that the referenced Defendants discriminated
against Amir by somehow causing him to be transferred from the Albany County Jail to the CNY
Psychiatric Center, where they denied him access to DOCCS programs such as SOTP and ARTP
because of his mental illness, Plaintiff ignores (1) the acknowledged need to transfer Amir from
the Albany County Jail to the CNY Psychiatric Center (due to his "display[] [of] signs and
symptoms of serious mental illness and suicidal ideation"), (2) the fact that the mental health care
provided at the CNY Psychiatric Center is alleged to be more comprehensive and individualized
than that in DOCCS programs (e.g., being "inpatient" care that offers "formal psychological
testing" and one-on-one "counseling"), and (3) the fact that Plaintiff appears to actually *complain*
that Amir was transferred from inpatient care at the CNY Psychiatric Center to DOCCS. (Dkt.
No. 38, at ¶¶ 15-20, 61-63 [Plf.'s Am. Compl].) Moreover, to the extent Plaintiff alleges that
Amir was not in fact provided this comprehensive and individualized care at the CNY
Psychiatric Center, that allegation challenges the adequacy of the mental health treatment that
Amir received, which is appropriately asserted in an Eighth Amendment claim, under the
circumstances.

mental health patients were treated differently than was Amir based on their particular mental illness (e.g., receiving access to TrICP, SOTP and/or ARTP), or even that all mental health patients were denied access to TrICP at Mid-State C.F., or to TrICP, SOTP and/or ARTP at Mid-State C.F.[17]  In any event, Plaintiff does not allege facts plausibly suggesting that non-mentally-ill inmates convicted of a disciplinary offense and serving a sentence in SHU can participate in programs and services (such as the TrICP, SOTP and ARTP).[18]

Regarding Plaintiff's failure-to-make-reasonable-accommodations theory of liability, the Court rejects that theory on the additional ground that the Amended Complaint does not allege facts plausibly suggesting any alternative accommodation that would have been reasonable under the circumstances, which involved the following: (1) the commission of a dozen increasingly serious disciplinary violations by Amir over a four-month period (stemming from charges of losing/damaging property, having property in an unauthorized location, smuggling property, committing an unreported identification change, refusing a direct order, creating a disturbance, fighting, committing violent conduct, creating another disturbance, committing an assault on staff, committing an unhygienic act, committing more violent conduct, committing another assault on staff, and committing another unhygienic act); and (2) sufficient assessment of his

---

[17]     Nor does Plaintiff allege facts plausibly suggesting that any inmates who were not convicted of sex offenders were enrolled in the SOTP at Mid-State C.F.  The Court notes that the Sex *Offender* Treatment Program does not, at least on its face, appear designed for inmates who have been sexually abused but those who have sexually abused others.

[18]     In this regard, the Court agrees with the AG Defendants that, based on Plaintiff's own factual allegations, it was not Amir's status as a mentally ill individual but his commission of eight disciplinary offenses starting "in early January 2010" (and resulting four-months of sentences in solitary confinement) that rendered him ineligible for the referenced programs and services.  (*See, e.g.,* Dkt. No. 38, at ¶¶ 92, 93 [Plf.'s Am. Compl.].)

mental health condition by various Defendants to result in two changes of his mental health diagnoses during that time period. (Dkt. No. 38, at ¶¶ 91, 92, 93, 95, 96, 97, 98, 99, 100, 103, 110, 111, 113 [Plf.'s Am. Compl.]; Dkt. No. 38, Attach. 4, at 9, 10-14 [attaching pages "8" through "13" of NYS Commission of Correction's Final Report, describing offenses]; Dkt. No. 38, Attach. 8, at 10 [attaching page "9" of NYS Commission of Correction's Final Report, stating that "SHU inmates are seen daily by mental health on SHU rounds and are offered private out of cell encounters bi-weekly"].) Under the circumstances, to the extent Plaintiff challenges the adequacy of the mental health attention and diagnoses that Amir received while in SHU, that challenge is appropriately asserted in an Eighth Amendment claim.

Regarding Plaintiff's request that the Court convert the AG Defendants' motion to dismiss to one for summary judgment, the Court denies that request on each of three alternative grounds: (1) it is nonsensical to argue that, under Fed. R. Civ. P. 12(d), the Court should consider matters outside the pleadings (on a motion to dismiss for failure to state a claim) merely because the non-movant has presented them;[19] (2) in any event, the Court finds it unnecessary to proceed to an evidentiary analysis of claims that, as here, have been shown to be not actionable;[20] and (3)

---

[19] The standard under Fed. R. Civ. P. 12(d) expressly acknowledges that the Court may exclude matters outside the pleadings that have been presented by a non-movant. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to *and not excluded by the court*, the motion must be treated as one for summary judgment under Rule 56.") (emphasis added). If the rule were otherwise, non-movants could convert all motions to dismiss into ones for summary judgment.

[20] *See, e.g., Hinson v. Depository Trust Co.*, 96-CV-2008, 1997 WL 16052, at *1 & n.1 (S.D.N.Y. Jan. 16, 1997) ("It is not necessary to consider DTC's alternative motion for summary judgment because the motions to dismiss can be decided [and granted] based upon the pleadings."); *Billard v. Rockwell Intern. Corp.*, 526 F. Supp. 218, 222 (S.D.N.Y. 1981) ("Rockwell's motion to dismiss the amended complaint for failure to state a claim is granted. This disposition makes unnecessary consideration of the other motions pending in this case.

in any event, granting Plaintiff's request would cause an undue delay in the resolution of these two claims (necessitated by the Court's having to give the AG Defendants a reasonable opportunity to supplement their motion papers with a Rule 7.1 Statement, give Plaintiff a reasonable opportunity to supplement her opposition papers with a Rule 7.1 Response, and give the AG Defendants a reasonable opportunity to supplement their reply papers).[21]

Finally, regarding Plaintiff's request for leave to file a Second Amended Complaint, the Court denies that request on each of three alternative grounds: (1) such leave need not be "freely" given to Plaintiff, because she has already filed an Amended Complaint;[22] (2) in any event, no

---

Accordingly, . . . defendants' motion for summary judgment against Billard . . . [is] denied as moot."); *cf. Kottler v. Deutsche Bank AG*, 607 F. Supp.2d 447, 463 (S.D.N.Y. 2009) ("It is unnecessary to consider the substance of the fraud-based claims because the claims do not satisfy the Rule 9(b) standard.").

[21]     *See, e.g., Tavares v. City of New York*, 09-CV-3499, 2010 WL 3036558, at *5, n.8 (S.D.N.Y March 12, 2010) ("Given that the plaintiff's claim fails on the merits, converting the motion [from one to dismiss to one for summary judgment] would create unnecessary expense and delay.").

[22]     *See Abascal v. Hilton*, 04-CV-1401, 2008 WL 268366, at *8 (N.D.N.Y. Jan. 13, 2008) (Kahn, J., adopting, on *de novo* review, Report-Recommendation by Lowe, M.J.) ("Of course, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading."), *aff'd*, 357 F. App'x 388 (2d Cir. 2009); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) (explaining that denial of leave to amend is not an abuse of discretion where movant has repeatedly failed to cure deficiencies in pleading); *Coleman v. brokersXpress, LLC*, 375 F. App'x 136, 137 (2d Cir. 2010) ("Nor can we conclude that the district court abused its discretion in denying Coleman leave to amend. The district court afforded Coleman one opportunity to amend the complaint, and Coleman made no specific showing as to how he would cure the defects that persisted if given a second opportunity to amend."); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) ("We do not mean to imply that the court has no power to dismiss a prolix complaint without leave to amend in extraordinary circumstances, such as where leave to amend has previously been given and the successive pleadings remain prolix and unintelligible."); *Prezzi v. Schelter*, 469 F.2d 691, 692 (2d Cir. 1972) (affirming dismissal of *pro se* plaintiff's amended complaint without leave to amend, for failure to state a claim upon which relief can be granted, without engaging in analysis of whether second amended complaint would be futile).

proposed Second Amended Complaint has been attached, in violation of Local Rule 7.1(a)(4); and (3) in any event, the proposed amendment is both unduly late and futile.[23]

**B.       Defendant Kingsley's Motion for Summary Judgment**

**1.       Parties' Briefing on Defendant Kingsley's Motion**

Generally, in her motion for summary judgment, Defendant Kingsley argues as follows: (1) with regard to Plaintiff's Eighth Amendment claim, the record contains no admissible evidence from which a rational fact finder could conclude that the allegedly inadequate medical care that Kingsley provided to Amir (by failing to perform a face-to-face interview with him, including a suicide screen, upon his arrival at Great Meadow C.F. at 2:15 p.m. on June 18, 2010) could produce death, degeneration, or extreme pain in him, given that (a) his chart did not indicate that he was going to hurt himself (and indeed it indicated that he had already been referred to mental health), (b) an essentially identical suicide screen was completed by Kilburn upon Amir's arrival at SHU at 2:36 p.m. that day, and (c) Amir was assessed by Registered Nurse Stevens at 2:48 p.m. that day; (2) in any event, the record contains no admissible evidence from which a rational fact finder could conclude that Kingsley acted with a sufficiently culpable mental state (i.e., deliberate indifference, which is akin to criminal recklessness, or knowing of and disregarding an excessive risk to inmate health and safety), given that (a) she made several unsuccessful attempts to have Amir brought to her area for a face-to-face interview, (b) she reviewed his chart and found nothing to indicate to her that he was going to hurt himself, (c) she

---

[23]       *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (explaining that permissible grounds upon which to base the denial of a motion for leave to file an amended complaint include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.").

knew that an identical suicide screen would be completed if Amir was admitted to SHU (which it had been, by Defendant Kilburn, at 2:36 p.m. that day), and (d) she was concerned enough about Amir's treatment to call a nurse at the SHU to ensure that he received his Synthroid; and (3) Plaintiff's pendent state-law claims are barred by New York Correction Law § 24. (Dkt. No. 130, Attach. 6 [Def. Kingsley's Memo. of Law].)

Generally, in response, Plaintiff argues as follows: (1) with regard to her Eighth Amendment claim, the record contains admissible evidence from which a rational fact finder could conclude that Defendant Kingsley's failure to obtain immediate mental health care for Amir was objectively serious and was likely to cause him serious harm; (2) moreover, the record contains admissible evidence from which a rational fact finder could conclude that Kingsley deliberately failed to provide Amir with the immediate OMH referral that she determined he needed; and (3) New York Correction Law § 24 does not bar Plaintiff's pendent state-law claims against Kingsley because that statute applies only to claims arising from actions or failures performed "within the scope of [Kingsley's] employment and in the discharge of [her] duties," and Plaintiff's claims against Kingsley all arise from failures that were not performed within the scope of her employment or in the discharge of her duties. (Dkt. No. 150 [Plf.'s Opp'n Memo. of Law].)

Generally, in reply, Defendant Kingsley argues as follows: (1) Plaintiff's counsel misinterprets *Salahuddin v. Goord*, 467 F.3d 263 (2d Cir. 2006), which imposes liability not for all failures to act but only for failures to act under circumstances in which the charged official was actually aware of a substantial risk that serious inmate harm would result (as a consequence of the failure to act), which circumstances are not present here; (2) the violation of an established

procedure, without more, does not constitute deliberate indifference; and (3) Plaintiff's pendent state-law claims against Kingsley are barred by New York Correction Law § 24, because those claims all arise from failures that were performed within the scope of Kingsley's employment or in the discharge of her duties (e.g., a negligent completion of a health screening form through a mere chart review). (Dkt. No. 160 [Def. Kingsley's Reply Memo. of Law].)

### 2. Ruling on Defendant Kingsley's Motion

After carefully considering the matter, the Court grants this motion for the reasons stated in Defendant Kingsley's memoranda of law. *See, supra*, Part III.B.1. of this Decision and Order. To those reasons, the Court adds the following analysis.

Plaintiff's claims against Defendant Kingsley are based on two acts of omission: (1) completing Amir's health screening form (upon his arrival of Great Meadow C.F.) based on only a review of his medical records (i.e., without conducting an in-person suicide screen), in violation of DOCCS policy; and (2) determining that Amir needed an immediate referral to OMH without separately making that referral, also in violation of DOCCS policy.

With regard to the first act of omission (i.e., completing Amir's health screening form without conducting an in-person suicide screen), it is undisputed that (regardless of whether she could have, or should have, departed from prior procedure and left her clinic unattended by a medical staff member to see Amir down in the SHU) Defendant Kingsley made several unsuccessful attempts to have Amir brought up to her area for a face-to-face interview. (Dkt. No. 130, Attach. 9, at 20 [attaching page "70" of Kingsley Depo.]; Dkt. No. 130, Attach. 2, at ¶¶ 6-7, 12 [Kingsley Decl.].)

Moreover, it is undisputed that, while Defendant Kingsley found from Amir's medical records that he needed an immediate referral to mental health, she did not see in those medical records any indication that he was an active suicide risk. (Dkt. No. 130, Attach. 2, at ¶ 9 [Kingsley Decl., stating, "From my review of Amir Hall's medical records, I did not see any indication that he was an active suicide risk"].)[24] Nor was she advised of any such risk from the transport officers, who recalled no unusual behavior from Amir during his transport. (Dkt. No. 130, Attach. 5, at ¶ 17 [Plf.'s Rule 7.1 Response, admitting fact].)

Furthermore, it is undisputed that, at the time Defendant Kingsley completed Amir's health screening form, she knew that, if he was going to SHU, he would receive a nearly identical suicide screening; and it is also undisputed that he received that suicide screening approximately16 minutes after arriving at Great Meadow C.F. (Dkt. No. 130, Attach. 9, at 7-8 [attaching pages "57" and "58" of Kingsley Depo.]; Dkt. No. 130, Attach. 5, at ¶¶ 17, 20 [Plf.'s Rule 7.1 Response, admitting fact].)

Finally, it is undisputed that Defendant Kingsley was sufficiently concerned about Amir's treatment to speak to a nurse assigned to the SHU to ensure that he received his Synthroid medication. (Dkt. No. 130, Attach. 9, at 39 [attaching page "89" of Kingsley Depo.]; Dkt. No. 130, Attach. 2, at ¶ 8 [Kingsley Decl.].)

---

[24] This is not surprising, given that Amir's *mental health* records stated that (despite Amir's assertion to individuals at the CNY Psychiatric Center, between August 31 and November 3, 2009, that he had previously attempted suicide "20 times") he had more recently denied suicidal ideation, and/or had been found by other medical staff to not exhibit warning signs of suicide, on at least the following dates: December 23, 2009; January 26, 2010; February 3, 2010; March 16, 2010; and June 7, 2010. (*See, e.g.,* Dkt. No. 130, Attach. 5, at ¶¶ 8, 9, 11, 13 [Plf.'s Rule 7.1 Response, admitting fact and/or not specifically controverting fact followed by citation to supporting record evidence].)

Based on these undisputed facts, it appears conceivable that a rational fact finder could conclude that Defendant Kingsley acted negligently by completing Amir's health screening form without conducting an in-person suicide screen; however, no rational fact finder could conclude that Kingsley acted with a mental state akin to criminal recklessness (i.e., *knowing* of, and disregarding, an *excessive* risk to inmate health and safety), even if she had been previously informed that completing a separate form based only on chart review was not proper practice.

With regard to the second act of omission (i.e., determining that Amir needed an immediate referral to OMH without separately making that referral), it is true that, when completing Amir's health screening form, Defendant Kingsley checked the box marked "Yes" next to the words "Immediate Referral to Mental Health." (Dkt. No. 147, Attach. 71, at 3 ["Health Screening for Intrasystem Transfer".) It is also true that Kingsley knew that the completed form, which would be put in Amir's chart, would not reach the doctor responsible for reviewing Amir's records for another three days (i.e., until Monday). (Dkt. No. 147, Attach. 97, at 11-13 [attaching pages "65" through "67" of Kingsley Depo.].)

However, it is undisputed that the Great Meadow C.F. mental health unit was staffed by at least one nurse during that three-day period. (Dkt. No. 130, Attach. 8, at 25-26 [attaching pages "25" and "26" of Kingsley Depo.]; Dkt. No. 130, Attach. 9, at 23 [attaching page "73" of Kingsley Depo.].) More importantly, it is undisputed that the form (which is generally not even looked at by the doctor) is not even what triggers the doctor's attention to an inmate's mental health problems. (Dkt. No. 147, Attach. 130, Attach. 9, at 17 [attaching page "67" of Kingsley Depo.].) Rather, it is undisputed that what triggers the doctor's attention is a packet containing, *inter alia*, a form listing the inmate's mental health problems. (Dkt. No. 147, Attach. 130, Attach. 9, at 18-19 [attaching pages "68" and "69" of Kingsley Depo.].)

In any event, it is undisputed that Defendant Kingsley checked the box merely because she was under the (correct) impression Amir was *already being seen* by mental health (effectively rendering her box checking redundant in nature). (Dkt. No. 130, Attach. 9, at 15, 17, 18, 28 [attaching pages "65," "67," "68," and "78" of Kingsley Depo.]; Dkt. No. 130, Attach. 2, at ¶ 14 [Kingsley Decl.].) Moreover, based on her experience, she assumed (again correctly, it turned out) that the Mid-State C.F. mental health staff had already contacted the Great Meadow C.F. mental health staff regarding Amir. (Dkt. No. 130, Attach. 8, at 23-24 [attaching pages "23" and "24" of Kingsley Depo.]; Dkt. No. 130, Attach. 9, at 18, 19, 21, 22 [attaching pages "68," "69," "71," and "72" of Kingsley Depo.].)[25]

Finally, setting aside the fact that the violation of a DOCCS procedure does not itself constitute a violation of the Eighth Amendment, the Court has difficulty locating in the record any admissible evidence that Defendant Kingsley even violated any DOCCS procedure by not separately making that referral under the circumstances. (Dkt. No. 130, Attach. 11, at 18 [attaching page "16" of of NYS Commission of Correction's Final Report, which does not, as asserted by Plaintiff, require a nurse to *separately* refer an inmate to mental health after checking the box marked "Immediate Referral to Mental Health."].)

Based on these undisputed facts, it appears conceivable that a rational fact finder could conclude that Defendant Kingsley acted negligently by determining that Amir needed an

---

[25]     Indeed, the Mid-State C.F. mental health staff had done so the day before, having faxed an OMH Termination/Transfer Progress Note which stated, in pertinent part, that Amir Hall had "[n]o perceptual or thought disorders. Thoughts clear, coherent, logical. No delusional content in speech . . . Adamantly denies homicidal/suicidal ideation intent or plan." (Dkt. No. 130, Attach. 11, at 15-16 [attaching pages "13" and "14" of NYS Commission of Correction's Final Report]; Dkt. No. 130, Attach. 2, at ¶ 10 [Kingsley Decl.].)

immediate referral to OMH without separately making that referral; however, no rational fact finder could conclude that Kingsley acted with a mental state akin to criminal recklessness (i.e., *knowing* of, and disregarding, an *excessive* risk to inmate health and safety).

Turning to Defendant Kingsley's New York Correction Law § 24 argument, the test to determine whether a defendant's actions fell "within the scope of [her] employment and in the discharge of [her] duties" (pursuant to New York Correction Law § 24) is "whether the act was done while the servant was doing [her] master's work no matter how irregularly, or with what disregard of instructions." *Cruz v. New York*, 13-CV-6131, 2014 WL 2547516, at *9 (W.D.N.Y. June 6, 2014). "Conduct engaged in for purely personal reasons unrelated to the employer's interests . . . which is a substantial departure from the normal methods of performing [an officer's or employee's] duties is not considered within the scope of employment." *Cruz*, 2014 WL 2547516, at *9 (internal quotation marks omitted). "Among the factors to be weighed are [the following]: [1] the connection between the time, place and occasion for the act; [2] the history of the relationship between the employer and employee as spelled out in actual practice; [3] whether the act is one commonly done by any employee; [4] the extent of departure from normal methods of performance; and [5] whether the specific act was one that the employer could reasonably have anticipated." *Id*.

Here, as stated earlier, Plaintiff's claims against Defendant Kingsley are based on two acts of omission: (1) completing Amir's health screening form based on only a review of his medical records; and (2) determining that Amir needed an immediate referral to OMH without separately making that referral.

The first act of omission occurred at Defendant Kingsley's place of employment, while she was performing a relatively routine responsibility (e.g., completing a health screening form for an inmate arriving at the correctional facility without leaving her clinic unattended by a medical staff member). The evidence indicates that the common practice was for inmates to be brought to Kingsley's clinic for such screenings. The extent of Kingsley's departure from normal methods of performance appears to have been limited to her failure to conduct an in-person suicide screen of Amir; she did, in fact, review his chart. Finally, Kingsley's act of omission (which were due to a shortage of medical staff at Kingsley's unit) appears to have been one that DOCCS could reasonably have anticipated.

The second act of omission also occurred at Defendant Kingsley's place of employment, while she was performing a relatively routine responsibility (e.g., completing a health screening form for an inmate arriving at the correctional facility). The evidence indicates that the common practice was to (1) not check the box (on the ground that the conclusion was based on information already known to the mental health unit) or (2) check the box and perhaps call the mental health unit to redundantly tell it something that it already knew. The extent of Kingsley's departure from normal methods of performance appears to have been limited to her checking a box in a redundant fashion (knowing Amir was already being seen by mental health) without either (1) entering an explanation in the "Comments" section of the form, or (2) calling the mental health unit in a further redundant fashion (knowing a nurse there would see the form). Finally, Kingsley's act of omission (which resulted from DOCCS' placement of a potentially redundant box on a form that a nurse would see but a doctor would not see over the weekend) appears to have been one that DOCCS could reasonably have anticipated.

Not surprisingly, under analogous circumstances, courts have found that acts of nurses were within the scope of their employment and in the discharge of their duties" pursuant to New York Correction Law § 24. *See, e.g., Dallio v. Hebert*, 678 F. Supp.2d 35, 57 (N.D.N.Y. 2009) (Report-Recommendation of Lowe, M.J., adopted by Suddaby, J.) (holding that alleged negligence committed by three prison nurses, through performing only a "surface" medical exam of an inmate and then meeting his sick call requests with "deliberate indifference," arose out of acts they performed within the scope of their employment, because they "were endeavoring to do their job–perhaps poorly–at the time of the charged transgressions").

As a result, the Court finds that Plaintiff's pendent state-law claims against Defendant Kingsley are barred by New York Correction Law § 24.

### C.      Defendant Davis' Motion for Summary Judgment

#### 1.      Parties' Briefing on Defendant Davis' Motion

Generally, in his motion for summary judgment, Defendant Davis argues as follows: (1) with regard to Plaintiff's Eighth Amendment claim, the record contains no admissible evidence from which a rational fact finder could conclude that the allegedly inadequate medical care that Davis provided to Amir (by failing to obtain immediate mental health intervention for Amir before his transfer to Great Meadow C.F.) could produce death, degeneration, or extreme pain in him, given (a) the lack of evidence (in cell-side contact notes from the two weeks before June 18, 2010) that Amir was a substantial risk of suicide, (b) the fact that Amir did not show up on the CNET database of active mental health patients (based on Davis' search of Amir's identification number on June 18, 2010), and information regarding his mental state did not show up on Davis' search of the FPMS database, and (c) the fact that, during their interaction on June 18, 2010,

Amir responded affirmatively to Davis' inquiry as to whether he understood what Davis was saying, and then stopped answering questions; (2) in any event, the record contains no admissible evidence from which a rational fact finder could conclude that Davis acted with a sufficiently culpable mental state (i.e., deliberate indifference, which is akin to criminal recklessness, or knowing of and disregarding an excessive risk to inmate health and safety), given that (a) Davis had not had contact with Amir before June 18, 2010, (b) Davis performed an unsuccessful search for Amir on the CNET database of active mental health patients (based on Amir's identification number) on June 18, 2010, and (c) Davis unsuccessfully attempted to engage Amir in conversation on June 18, 2010, in an effort to determine if he was mentally ill; (3) in any event, at the very least, Davis is protected from liability as a matter of law by the doctrine of qualified immunity because, based on the current record, no rational fact finder could deny that officers of reasonable competence could disagree on the legality of Davis' actions; and (4) Plaintiff's pendent state-law claims should be dismissed because (a) they are barred by New York Correction Law § 24, and (b) even if they are not barred, the Court should decline to exercise supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367. (Dkt. No. 134, Part 20 [Def. Davis' Memo. of Law].)

Generally, in response, Plaintiff argues as follows: (1) with regard to Plaintiff's Eighth Amendment claim, the record contains admissible evidence from which a rational fact finder could conclude that Defendant Davis' failure to obtain an immediate mental health intervention for Amir before his transfer to Great Meadow C.F. was objectively serious and was likely to cause Amir serious harm; (2) moreover, the record contains admissible evidence from which a rational fact finder could conclude that Davis knew that Amir was an active mental health patient

who was at risk for suicide (due to Davis' membership of a "Treatment Team" that met daily and discussed inmates, the fact that Amir's status as an active mental health patient is evident from a search of the CNET database, and the fact that various information about Amir is present on the FPMS database), and therefore *deliberately* failed to obtain an immediate mental health intervention for Amir before his transfer to Great Meadow C.F.; (3) based on the current record, Davis is not entitled to qualified immunity, because (a) there are genuine disputes of material fact regarding whether Davis acted with deliberate indifference to Amir's serious medical needs, and (b) the Second Circuit has held that in such a circumstance it would never be objectively reasonable for an officer to believe his conduct did not violate a plaintiff's rights; and (4) Plaintiff's pendent state-law claims against Davis are not barred by New York Correction Law § 24, because that statute applies only to an employee of DOCCS, and Davis is an employee not of DOCCS but of OMH. (Dkt. No. 150 [Plf.'s Opp'n Memo. of Law].)

Generally, in reply, Defendant Davis argues as follows: (1) Plaintiff offers mere speculation and conjecture regarding whether Davis was, or was not, aware of Amir's serious mental health needs immediately prior to his transfer (e.g., arguing that Davis *must have* known about Amir's serious mental health needs, because Davis was a member of a "Treatment Team" that met daily to discuss numerous inmates with outstanding disciplinary tickets, Davis conducted an identification-number search of a database that Plaintiff's counsel admits "inexplicably" omits certain records regarding Amir, and Davis searched a separate database that did not reveal specific information regarding Amir's mental state); (2) in any event, there is no admissible record evidence from which a rational fact finder could conclude that Davis was totally unconcerned with Amir's welfare, especially given the fact that Davis (a) responded

quickly to a call regarding a possible forced-cell extraction, (b) researched Amir on two databases, (c) visited Amir's cell, (d) personally attempted to engage Amir in conversation, and (e) reported what happened to his supervisor and asked if it was necessary to write up the incident; (3) Plaintiff's qualified-immunity argument is unpersuasive because, while there may be a disputed fact regarding Amir's treatment, the disputed fact must go to the heart of whether Defendant Davis was deliberately indifferent to Amir's medical needs (which it does not); and (4) contrary to Plaintiff's argument regarding New York Correction Law § 24, that statute has been held to apply to employees of other state agencies who are working with prisoners in state prisons, including OMH social workers.  (Dkt. No. 158 [Def. Davis' Reply Memo. of Law].)

### 2.    Ruling on Defendant Davis' Motion

After carefully considering the matter, the Court grants this motion for the reasons stated in Defendant Davis' memoranda of law.  *See, supra*, Part III.C.1. of this Decision and Order.  To those reasons, the Court adds the following analysis.

Before June 18, 2010, Davis's main responsibilities as a Social Worker II were to look after his patients in the Immediate Care Program (a part of the Mental Health Unit), which was located in a building (Building 27) separate from the building (Building 10) that housed Amir in SHU at Mid-State C.F.  (Dkt. No. 134, Attach. 6, at 18, 19, 21, 36, 77, 100, 106, 117, 119, 141, 169 [attaching pages "17," "18," "20," "35," "76," "99," "105," "116," "118," "139," and "168" of Davis Depo. Tr.]; Dkt. No. 134, Attach. 3, at ¶ 7 [Davis Decl.]; Dkt. No. 149, at 65, ¶ 16 [Plf.'s Rule 7.1 Response, admitting fact].)  Davis did not have patients in the SHU, nor was the SHU his normal place to work.  (*Id*.)

On June 18, 2010, the staff member who normally responded to an emergency in SHU was not there, and Davis was the emergency person on call. (Dkt. No. 134, Attach. 6, at 118-119 [attaching pages "117" and "118" of Davis Depo. Tr.]; Dkt. No. 134, Attach. 12, at 160 [attaching page "159" of Silberberg Depo. Tr.]; Dkt. No. 166, Attach. 64, at 7 [Davis Statement dated 7/26/10].) Because Davis was the emergency person on call, he was told by the OMH Unit Chief to "get up [to SHU] quick [to assist in the extraction of Amir from his cell]"; and Davis perceived "things [to be] happening in . . . really fast motion." (Dkt. No. 134, Attach. 6, at 91, 99, 100, 108, 109, 115 [attaching pages "90," "98," "99," "107," "108" and "114" of Davis Depo. Tr., testifying also "I don't know if I had the time"]; Dkt. No. 134, Attach. 9, at 2 [Staff Interview of Davis dated 7/26/10]; Dkt. No. 134, Attach. 10, at 2 [Statement of Davis dated 7/26/10].) At the time, Davis did not remember Amir (who had never been a patient of his), or whether Amir was a mental health patient. (Dkt. No. 134, Attach. 6, at 100, 101, 121 [attaching pages "99," "100," and "120" of Davis Depo. Tr.]; Dkt. No. 134, Attach. 3, at ¶¶ 10, 11 [Davis Decl.].)[26]

_____

[26]    Plaintiff argues that Davis *must have* remembered that Amir was a mental health patient because Davis was a member of a "Treatment Team" that had discussed inmates in the RCTP on a daily basis (and had discussed Amir up to a dozen times between January 2, 2010, and June 2, 2012). (Dkt. No. 134, Attach. 6, at 47, 48, 100 [attaching pages "46," "47," and "99" of Davis Depo. Tr.]; Dkt. No. 147, Attach. 90, at 7 [attaching page "49" of Farago Depo. Tr.].) However, the Treatment Team's discussion of Amir (who, again, was never a patient of Davis' and was housed in a different building) was buried in the presentation of (1) "nursing reporting information" (i.e., general information and concerns nurses may have, e.g., if they had seen someone on emergency the night before), (2) general announcements (e.g., whether there was a policy change or some educational opportunity), and (3) any clinical concerns of each team member (of which there were ten or eleven). (Dkt. No. 134, Attach. 6, at 45, 46, 47 [attaching pages "44," "45," and "46" of Davis Depo. Tr.]; Dkt. No. 168, Attach. 1, at 1-2 [attaching pages "41" and "42" of Farago Depo. Tr.].) Not surprisingly, the Clinical Director, Dr. Lawrence Farago did not remember Amir. (Dkt. No. 147, Attach. 90, at 9, 10, 12 [attaching pages "52," "53," and "56" of Farago Depo. Tr.].) In any event, the last such possible discussion occurred on June 2, 2010, more than two weeks before Davis' hurried attempt to comply with his boss's request or order to respond to an emergency (the type of which he normally did not cover).

As a result, before interacting with Amir, Davis searched for him on the CNET database. (Dkt. No. 134, Attach. 6, at 101, 102, 104, 107, 108, 109, 116, 121, 122, 123, 124 [attaching pages "100," "101," "103," "106," "107," "108," "115," "120," "121," "122" and "123" of Davis Depo. Tr.]; Dkt. No. 134, Attach. 9, at 2-3 [Staff Interview of Davis dated 7/26/10]; Dkt. No. 166, Attach. 64, at 7 [Statement of Davis dated 7/26/10].) CNET is a statewide database that contains basic case information about inmates who are active mental health patients, such as (1) whether they are suicidal, (2) what their mental health levels are, and (3) what their diagnoses are. (Dkt. No. 134, Attach. 6, at 102, 103, 104, 108 [attaching pages "101," "102," "103," and "107" of Davis Depo. Tr.]; Dkt. No. 134, Attach. 3, at ¶ 13 [Davis Decl.]; Dkt. No. 134, Attach. 9, at 2 [Staff Interview of Davis dated 7/26/10].) When Davis searched for Amir on the CNET database, he did so by Amir's identification number; and Amir did not show up on the database, leading Davis to believe that Amir was not an active mental health patient. (Dkt. No. 134, Attach. 6, at 101, 102, 104, 107, 108, 109, 116, 121, 122, 123, 124 [attaching pages "100," "101," "103," "106," "107," "108," "115," "120," "121," "122" and "123" of Davis Depo. Tr.]; Dkt. No. 134, Attach. 9, at 2-3 [Staff Interview of Davis dated 7/26/10]; Dkt. No. 166, Attach. 64, at 7 [Statement of Davis dated 7/26/10].)[27]

--------

Simply stated, any inference that Davis remembered a certain fact on June 18, 2010, based on his prior *access* to such a fact is rendered *unreasonable* by (1) the speculative nature of his prior *knowledge* of that fact, (2) the passing of at least two weeks after any acquisition of such knowledge, and (3) the fact that Davis perceived things to be happening in "really fast motion" on June 18, 2010 (and that Davis was not the staff member who normally responded to such emergencies in SHU). At its core, Plaintiff's must-have-remembered argument is a should-have-remembered argument, which is insufficient to confer liability under the Eighth Amendment.

[27]     Plaintiff attempts to dispute the evidence that Amir did not show up on the CNET database after Davis' search on June 18, 2010, by submitting the results of a search for Amir on the CNET database that did show Amir. (Dkt. No. 147, Attach. 78.) However, Plaintiff ignores

In order to find out find out information about Amir that would aid Davis in forming a bond with Amir to better facilitate the extraction, Davis searched for Amir on the FPMS database. (Dkt. No. 134, Attach. 6, at 109-112, 125, 126 [attaching pages "108," "109," "110," "111," "124" and "125" of Davis Depo. Tr.]; Dkt. No. 134, Attach. 9, at 2-3 [Staff Interview of Davis dated 7/26/10]; Dkt. No. 166, Attach. 64, at 7 [Statement of Davis dated 7/26/10].) On the FPMS database, Davis found information such as when Amir was being released, where his home was, and whether he had family there. (Dkt. No. 134, Attach. 6, at 109, 125 [attaching pages "108" and "124" of Davis Depo. Tr.]; Dkt. No. 134, Attach. 9, at 2-3 [Staff Interview of Davis dated 7/26/10]; Dkt. No. 166, Attach. 64, at 7 [Statement of Davis dated 7/26/10].) While the FPMS database also contained Amir's disciplinary history, how long he had been in the SHU, and discrete references to mental illness (i.e., his attempted suicide by pill overdose in 2000, his "psych" medication in 2008, his discharge to OMH on 9/4/09, and his reclassification from OMH Level 1 to OMH Level 2 on 6/7/10), Davis did not see that information. (Dkt. No. 134, Attach.

_____

that the search on which she relies was conducted *years later*, apparently on March 13, 2014. (Dkt. No. 147, Attach. 78, at 14 [attaching copy of Amir's CNET Entry indicating a medication-addition start date" of "03/13/2014"].) Plaintiff also ignores that the search on which she relies was apparently not conducted based only on Amir's identification number, as was Davis' search of Amir. (Dkt. No. 147, Attach. 78, at 2 [attaching copy of Amir's CNET Entry indicating "HALL, AMIR – 08A0024" in the field labeled "Enter Patient"].) Plaintiff also ignores that, on June 18, 2010, Amir was in the process of being transferred out of Mid-State C.F., and it is unclear if CNET was (at that time) a statewide database or if it was specific to Mid-State C.F. (Dkt. No. 134, Attach. 6, at 104, 108 [attaching pages "103" and "107" of Davis Depo. Tr.].) Plaintiff also ignores that, on June 18, 2010, CNET was merely "the most reliable work tool" (relative to other, unreliable database). (Dkt. No. 134, Attach. 6, at 102, 103, 104 [attaching pages "101," "102," and "103" of Davis Depo. Tr.].) Finally, Plaintiff admits that the search results on which she relies themselves omit certain records regarding Amir (specifically, two of his RCTP admissions). (Dkt. No. 150, at 42 [attaching page "36" of Plf.'s Opp'n Memo. of Law].) For all of these reasons, any inference that Amir would have showed up (or did show up) on a CNET search on June 18, 2010, because he showed up in 2014 is unreasonable.

33

6. at 110, 111, 115, 116, 142, 167, 168 [attaching pages "109," "110," "114," "115," "141,"

"166," and "167" of Davis Depo. Tr.]; Dkt. No. 132, Attach. 3, at 8, 9, 13, 21 [attaching pages of

data stored in the FPMS database regarding Amir, on Feb. 11, 2014].)[28]

Davis did not look Amir up in the MHARS database, because (1) it was only "somewhat

reliable," and (2) he did not feel he had the time to do so.  (Dkt. No. 134, Attach. 6. at 102, 103,

115 [attaching pages "102," "103," and "114" of Davis Depo. Tr.].)  Moreover, Davis did not

look Amir up in the DMHIS database, because he did not have access to it on June 18, 2010.

(Dkt. No. 134, Attach. 6. at 112-113 [attaching pages "111" and "112" of Davis Depo. Tr.].)[29]

---

[28]     Plaintiff attempts to dispute the evidence that Davis did not see these references to
Amir's mental illness in the FPMS database on June 18, 2010, by submitting a printout of data
stored in the FPMS database containing the references.  (Dkt. No. 132, Attach. 3.)  However,
Plaintiff ignores that the search on which she relies was conducted *years later*, apparently on or
about February 11, 2014.  (Dkt. No. 132, Attach. 3, at 1 [attaching Certification of Records].)
Plaintiff also ignores that there were only a handful of such discrete references in the search
results, which were buried in 34 pages of other information.  (Dkt. No. 132, Attach. 3.)  Plaintiff
also ignores that, at the time Davis searched the FPMS database, he was assuming that Amir was
*not* a mental health patient (and was searching only for information to help him form a bond with
Amir).  (Dkt. No. 134, Attach. 6. at 109, 121 [attaching pages "108" and "120" of Davis Depo.
Tr.].)  Finally, Plaintiff ignores that Davis was told by the OMH Unit Chief to "get up there [to
SHU] quick," and perceived "things [to be] happening in . . . really fast motion." (Dkt. No. 134,
Attach. 6, at 108, 109, 115 [attaching pages "107," "108" and "114" of Davis Depo. Tr.,
testifying also"I don't know if I had the time"].)  For all of these reasons, any inference that Davis
saw any reference to Amir's mental illness during his FPMS search on June 18, 2010, merely
because the FPMS database contained those references in 2014 is unreasonable.

[29]     The Court notes that any argument that Davis acted with criminal recklessness
because he did not precisely follow Mid-State C.F.'s "clinical practice" (through taking certain
steps to research Amir prior to talking to him) is unpersuasive, considering that (1) the referenced
practice was not a *policy*, (2) the practice involved searching the DMHIS database, to which
Davis did not have access that day, (3) the practice presumed that the staff member on call
*already knew* that the inmate was a mental health patient, which Davis did not know (after
unsuccessfully searching for him on CNET), (4) Davis had not previously received *training* on
how to respond to cell extractions (regardless of whether the "clinical practice" was mentioned
during Davis' orientation), (5) Davis was not the staff member regularly on call to respond to
emergencies in SHU, and (6) Davis had served as the staff member on call for emergencies in

After obtaining certain information about Amir (such as his release date, home town and family members' residences) from the FPMS database, Davis walked to Amir's cell and attempted to engage him in dialogue. (Dkt. No. 134, Attach. 6. at 109, 125, 126 [attaching pages "108," "124" and "125" of Davis Depo. Tr.]; Dkt. No. 134, Attach. 9, at 2-3 [Staff Interview of Davis dated 7/26/10]; Dkt. No. 166, Attach. 64, at 7 [Statement of Davis dated 7/26/10].)

When Davis reached Amir's cell, he observed Amir lying on his bed, with a sheet over his head. (Dkt. No. 149, at ¶ 23 [Plf.'s Rule 7.1 Response, admitting fact].)

In an effort to get Amir to leave his cell, Davis talked to Amir about his release date, his going closer to home and his family members' expectation of his arrival. (Dkt. No. 134, Attach. 6. at 125-126 [attaching pages "124" and "125" of Davis Depo. Tr.]; Dkt. No. 134, Attach. 9, at 2-3 [Staff Interview of Davis dated 7/26/10]; Dkt. No. 166, Attach. 64, at 7 [Statement of Davis dated 7/26/10].) Davis asked him to please come out of his cell, and why he did not want to come out of his cell. (Dkt. No. 134, Attach. 6. at 125, 127, 129 [attaching pages "124," "126," and "128" of Davis Depo. Tr.].) In addition, Davis may have asked Amir if he was experiencing any feelings of hopelessness, if he was planning on hurting himself, and what time it was. (Dkt. No. 134, Attach. 6. at 127, 130, 132 [attaching pages "126," "129," and "131" of Davis Depo. Tr.].) However, Amir did not verbally respond. (Dkt. No. 134, Attach. 6. at 125-126, 130 [attaching pages "124," "125," and "129" of Davis Depo. Tr.]; Dkt. No. 134, Attach. 9, at 2-3 [Staff Interview of Davis dated 7/26/10]; Dkt. No. 166, Attach. 64, at 7 [Statement of Davis dated 7/26/10].)

---

SHU only once before. (Dkt. No. 147, Attach. 93, at 18, 19, 20 [attaching pages "207," "208," and "209" of Tourtelot Depo. Tr.]; Dkt. No. 134, Attach. 6, at 97, 98 [attaching pages "96" and "97" of Davis Depo. Tr.].)

When Davis ask him to "at least show me that you're doing okay," Amir moved his arm, which Davis interpreted as a yes–that Amir was not in psychiatric distress and was coherent. (Dkt. No. 134, Attach. 6. at 127-129 [attaching pages "126," "127," and "128" of Davis Depo. Tr.]; Dkt. No. 134, Attach. 9, at 2-3 [Staff Interview of Davis dated 7/26/10]; Dkt. No. 166, Attach. 64, at 7 [Statement of Davis dated 7/26/10].) Davis may have mistaken Amir's refusal to come out of his cell as a sign that he was angry at something. (Dkt. No. 134, Attach. 6. at 130-131 [attaching pages "129" and "130" of Davis Depo. Tr.].)

After repeatedly attempting to speak to Amir for a period of between "a few minutes" and "10-15 minutes," Davis left Amir's cell. (Dkt. No. 134, Attach. 6. at 130 [attaching page "129" of Davis Depo. Tr.]; Dkt. No. 134, Attach. 9, at 2-3 [Staff Interview of Davis dated 7/26/10]; Dkt. No. 166, Attach. 64, at 7 [Statement of Davis dated 7/26/10].)

Davis went to the office in Building 10 and told the DOCCS personnel there that Amir was unresponsive and that Davis was unsuccessful in retrieving Amir from the cell. (Dkt. No. 134, Attach. 6. at 138, 139, 140 [attaching pages "137" and "138" of Davis Depo. Tr.]; Dkt. No. 134, Attach. 9, at 2-3 [Staff Interview of Davis dated 7/26/10]; Dkt. No. 166, Attach. 64, at 7 [Statement of Davis dated 7/26/10].) Then Davis went back to his unit in Building 27 and reported to the Unit Chief what had happened. (Dkt. No. 134, Attach. 6. at 141, 142 [attaching pages "139" and "140" of Davis Depo. Tr.].) When Davis asked the Unit Chief if he (Davis) needed to prepare a note documenting his interaction with Amir, the Unit Chief asked if Amir was an open mental health patient; and, when Davis responded no, the Unit Chief responded that no note needed to be prepared. (Dkt. No. 134, Attach. 6. at 141 [attaching page "140" of Davis Depo. Tr.].)

36

Based on these undisputed facts, it appears conceivable that a rational fact finder could conclude that Defendant Davis acted negligently by failing to obtain an immediate mental health intervention for Amir before his transfer to Great Meadow C.F.; however, no rational fact finder could conclude that Defendant Davis acted with a mental state akin to criminal recklessness (i.e., *knowing* of, and disregarding, an *excessive* risk to inmate health and safety).  At the very least, no rational fact finder could deny that prison social workers of reasonable competence could disagree on the legality of Defendant Davis' actions.

Finally, with regard to Defendant Davis' argument that Plaintiff's pendent state-law claims against him should be dismissed pursuant to New York Correction Law § 24 and 28 U.S.C. § 1367, the Court finds that those claims should be dismissed without prejudice to refiling in state court in accordance with 28 U.S.C. § 1367(d), because they (1) are unaccompanied by any surviving federal claim against Davis, (2) are sufficiently discrete from the federal claims that survive against Defendants Porter, Tourtelot and Farago (discussed below in Part III.E.2.a.ix. of this Decision and Order), and (3) raise a complex issue of state law.[30]

---

[30]    The Court notes that Davis' New York Correction Law § 24 challenge to Plaintiff's pendent state-law claims appears to present a close call. *Compare Povoski v. Artus*, 11-CV-0120, 2014 WL 1292219, at *2, 4 & n.2 (N.D.N.Y. Mar. 28, 2014) (Hurd, J.) (treating Social Worker Bonner and Nurse Waldron, employed by OMH at Clinton C.F., as "DOCCS employees" for purposes of N.Y. Correction Law § 24) *and Brown v. Dep't of Corr. Servs.*, 09-CV-0949, 2011 WL 2182775, at *8 (W.D.N.Y. June 11, 2011) (treating Mental Health Unit Coordinator Denise Fuller, employed by OMH at Southport C.F., as a "DOCCS employee" for purposes of N.Y. Correction Law § 24) *with Reeder v. Hogan,* 09-CV-0977, 2011 WL 1484118, at *13, n.13 (N.D.N.Y. March 1, 2011) (Peebles, M.J.) ("Section 24 does not shield non-DOCS personnel, including employees of the OMH, from liability.") (citing *Lumpkin v. Albany Truck Rental Servs., Inc.*, 70 A.D.2d 441, 444 [N.Y.S. App. Div., 3d Dep't 1979]).

**D. Plaintiff's Motion *in Limine* to Partially Exclude the Expert Testimony Relied on by the AG Defendants in Their Motion for Partial Summary Judgment**

**1. Parties' Briefing on Plaintiff's Motion *in Limine***

Generally, in her motion *in limine*, Plaintiff requests that the Court exclude the testimony of the AG Defendants' expert, Dr. Andrew Kaufman, to the extent that he opines on the legal standards applicable in this case. (Dkt. No. 146, Attach. 4 [Plf.'s Memo. of Law].) In support of her request, Plaintiff asserts two arguments: (1) Dr. Kaufman's conclusion that Defendants Stemen, Peroni, Sullivan, Bakall, Farago, Porter and Tourtelot were not "deliberately indifferent" to Amir's mental health care (expressed on pages 3 through 9 of his report), and his conclusion that the Dr. Farago's discontinuation of certain of Amir's anti-depressant medication was not the "proximate cause" of Amir's suicide (expressed on page 6 of the report), are prohibited by the Second Circuit, because those conclusions, expressed in terms of inadequately explored legal criteria, usurp both the trial judge's role in instructing the jury and the jury's role in deciding questions of fact; and (2) even assuming that those opinions are the proper subject of expert testimony, Dr. Kaufman is not qualified to render those opinions, because his expertise is in medicine, not the law.  (*Id.*)

Generally, in response, the AG Defendants argue that an Order striking the referenced portions of Dr. Kaufman's report is unnecessary and drastic: (1) the Court can, and should, give the referenced portions of Dr. Kaufman's testimony appropriate weight based on both his extensive experience and his education (which included studying cases regarding mental health law during a fellowship in forensic psychiatry, and auditing a course in civil procedure at a law school); and (2) even if the referenced portions of Dr. Kaufman's testimony are impermissible,

the Court can and should, exercise its discretion to simply overlook those portions, rather than issue a drastic Order striking them from the record.  (Dkt. No. 159 [AG Defs.' Opp'n Memo. of Law].)

Generally, in reply, Plaintiff argues as follows: (1) the mere act of studying some cases regarding mental health law and auditing a civil procedure course does not somehow qualify a person (especially a non-lawyer) to opine on legal issues such as deliberate indifference and proximate cause; and (2) regardless of whether the Court expressly strikes the referenced portions of Dr. Kaufman's report, or simply disregards them, the practical effect is the same. (Dkt. No. 162 [Plf.'s Reply Memo. of Law].)

### 2.    Ruling on Plaintiff's Motion *in Limine*

After carefully considering the matter, the Court grants this motion for the reasons stated in Plaintiff's memoranda of law.  *See, supra*, Part III.D.1. of this Decision and Order.  The following portions of Dr. Kaufman's report are hereby struck from the record: (1) his conclusion that Defendants Stemen, Peroni, Sullivan, Bakall, Farago, Porter and Tourtelot did not "demonstrate deliberate indifference toward the mental health care of Amir Hall" (expressed on pages 3 through 9 of his report); and (2) his conclusion that Dr. Farago's "discontinuation of [Amir's antidepressant] medication was not a proximate cause of [Amir's] suicide" (expressed on page 6 of the report).  (Dkt. No. 132, Attach. 10, at 3-9 [Kaufman Report].)  While those portions of Dr. Kaufman's report need not be redacted by either defense counsel or the Clerk of the Court, they will not be considered by the Court in deciding the AG Defendants' motion for partial summary judgment.

### E. The AG Defendants' Motion for Partial Summary Judgment

#### 1. Parties' Briefing on the AG Defendants' Motion for Partial Summary Judgment

Generally, in their motion for partial summary judgment, the AG Defendants assert the following four arguments: (1) the record contains no admissible evidence from which a rational jury could find an Eighth Amendment violation by any of the AG Defendants, generally because of (a) their limited involvement in Amir's diagnosis and treatment, (b) the adequacy of that diagnosis and treatment, and/or (c) their lack of a culpable state of mind; (2) in the alternative, Plaintiff neither alleges facts plausibly suggesting, nor adduces admissible record evidence establishing, that the supervisory AG Defendants (i.e., Hogan, Fisher, Hulihan and Kelly) were personally involved in Amir's care and treatment sufficient to render them liable for the claims asserted in Plaintiff's Second Cause of Action; (3) in any event, at the very least, the AG Defendants are protected from liability as a matter of law by the doctrine of qualified immunity because, based on the current record, no rational fact finder could deny that doctors, nurses, social workers, correctional officers and correctional supervisors of reasonable competence could disagree on the legality of the AG Defendants' actions; and (4) Plaintiff's pendent state-law claims should be dismissed because (a) the claims against the DOCCS employees (i.e., Defendants Fischer, Hogan, Hulihan, Kelly, DeRider, Wiernecki, Ward, Holmer, Kane, Dischiavo, Buckbee, Johnson, Lashway, Evans, Husnay, Tedesco, Norwich and Savitsky) are barred by New York Correction Law § 24, and (b) the Court should decline to exercise supplemental jurisdiction over the claims against the OMH employees (i.e., Defendants DeHimer, Hunter, Hutchinson, Nelson, Peroni, Stemen, Bakall, Sullivan, Farago, Porter,

Tortelet, Cunningham and Dill-Lewis) pursuant to 28 U.S.C. § 1367. (Dkt. No. 132, Attach. 14 [AG Defs.' Memo. of Law].)

Generally, in response, Plaintiff argues as follows: (1) the record does contain admissible evidence from which a rational jury could find an Eighth Amendment violation by the AG Defendants, generally because (a) Amir suffered from a serious mental illness (i.e., Major Depressive Disorder with Psychotic Features), and (b) the AG Defendants' misdiagnosis of and/or failure to treat (or refer Amir for treatment of) that condition rose to the level of gross negligence; (2) three of the four supervisory Defendants (i.e., Hogan, Fischer and Hulihan) were personally involved in Amir's care and treatment, because they approved, continued, promulgated and enforced a policy or custom under which unconstitutional practices occurred; and (3) based on the current record, the AG Defendants are not entitled to qualified immunity, because (a) there are genuine disputes of material fact regarding whether the AG Defendants acted with deliberate indifference to Amir's serious medical needs, and (b) the Second Circuit has held that in such a circumstance it would never be objectively reasonable for a prison official to believe his or her conduct did not violate a plaintiff's rights. (Dkt. No. 150 [Plf.'s Opp'n Memo. of Law].)

Generally, in reply, the AG Defendants argue the record does not contain admissible evidence from which a rational jury could find an Eighth Amendment violation by any of the AG Defendants, generally because (a) the health-care-providing AG Defendants' revision of Amir's diagnosis was proper and their treatment of him was adequate, and any misdiagnosis or inadequate treatment did not constitute acts of deliberate indifference, and (b) the security-staff AG Defendants' administration of punitive sanctions against Amir for violating the Rules of

Inmate Behavior did not constitute cruel and unusual punishment. (Dkt. No. 157, Attach. 5 [AG Defs.' Reply Memo. of Law].)

### 2. Ruling on the AG Defendants' Motion for Partial Summary Judgment

After carefully considering the matter, the Court largely agrees with the AG Defendants for the reasons stated in their memoranda of law, but partially disagrees with them for the reasons stated in Plaintiff's opposition memorandum of law. Specifically, the Court renders the following findings regarding the AG Defendants' four arguments.

### a. The AG Defendants' First Argument

With regard to the AG Defendants' first argument (i.e., that the record contains no admissible evidence from which a rational jury could find an Eighth Amendment violation by any of the AG Defendants), the Court finds as follows.

### i. Nelson

With regard to Defendant Nelson (a psychiatrist), her sole interaction with Amir during his inpatient treatment at CNY Psychiatric Center was her evaluation of him on August 31, 2009, and approval of a one-hour physical-restraint order to control his suicidal threats and gestures.[31] Plaintiff does not oppose the entry of summary judgment on her inadequate-medical-care claim against Defendant Nelson. (Dkt. No. 150, at 9, n.1 [attaching page "3" of Plf.'s Opp'n Memo. of Law].) As a result, this claim is dismissed.

### ii. Peroni

With regard to Defendant Peroni (a social worker), her involvement in Amir's inpatient treatment at CNY Psychiatric Center was the following: (1) meeting with Amir upon his

---

[31]    (Dkt. No. 149, at ¶¶ 46-47 [Plf.'s Rule 7.1 Response, admitting facts].)

admission on August 31, 2009 (and creating a record of that meeting on September 4, 2009, in which she stated, *inter alia*, that "[e]xploration in[to] [Amir's statement of having had sexual contact with many family members was] clinically contraindicated at this time until further evaluation"); (2) seeing him for additional evaluation and psychotherapy on September 8, 17, 25, and November 3, 2009; (3) writing a Discharge Patient Care Monitoring Note regarding him on October 27, 2009, which, *inter alia*, reported that his diagnoses had been revised from "Major Depressive Disorder, Single Episode, Severe with Psychotic Features, Polysubstance Dependence" upon admission to "Polysubstance Dependence [and] Borderline Personality Disorder" upon discharge, and recommended that ("[o]nce [he] has completed reception" at another correctional facility) he be placed in TrICP; and (4) reviewing his Discharge Plan on November 2, 2009.[32]

The crux of Plaintiff's claim against Defendant Peroni appears to be that she knew of Amir's need to be placed in TrICP, but willfully failed to follow up on her recommendation that he be placed in TrICP. Plaintiff argues that the fact that TrICP was not available at either Downstate C.F. or Mid-State C.F. is irrelevant, because Defendant Peroni should have *also* recommended that Amir be transferred to an appropriate facility or otherwise arranged for him to receive therapy from an outside provider. (Dkt. No. 150, at 33-34 [attaching pages "27" and "28" of Plf.'s Opp'n Memo. of Law].)

For the sake of brevity, the Court will assume that (1) Defendant Peroni knew that TrICP was not available at the facility to which Amir would be transferred and (2) her recommendation

---

[32]     (Dkt. No. 149, at ¶¶ 83-89, 99 [Plf.'s Rule 7.1 Response, admitting facts asserted by the AG Defendants]; Dkt. No. 166, Attach. 7 [CNYPC Inpatient Discharge Patient Care Monitoring].)

that he be placed in TrICP did not implicitly contain a recommendation that he transferred to a facility that offered TrICP (although those facts are far from clear in the record). Nor will the Court linger on the lack of admissible record evidence establishing that Defendant Peroni possessed the authority to effect or even influence such a prison transfer or arrangement. More important is that, while it appears conceivable that a rational fact finder could conclude that Defendant Peroni acted negligently under the circumstances, no rational fact finder could conclude that she acted with a mental state akin to criminal recklessness. As a result, this claim is dismissed.

### iii.     Hunter

With regard to Defendant Hunter (a social worker), her sole involvement in Amir's inpatient treatment at CNY Psychiatric Center was writing Progress Notes regarding him on September 29, and October 5, 13, and 22, 2009, "in the absence of [his] regularly scheduled primary therapist."[33] Plaintiff does not oppose the entry of summary judgment on her inadequate-medical-care claim against Defendant Hunter. (Dkt. No. 150, at 9, n.1 [attaching page "3" of Plf.'s Opp'n Memo. of Law].) As a result, this claim is dismissed.

### iv.     Hutchinson and Dehimer

With regard to Defendants Hutchinson and Dehimer (a nurse and nurse supervisor, respectively), their sole involvement in Amir's inpatient treatment at CNY Psychiatric Center was writing approximately 30 Progress Notes regarding him.[34] Plaintiff does not oppose the entry of summary judgment on her inadequate-medical-care claims against Defendants

---

[33]     (Dkt. No. 149, at ¶¶ 79-82 [Plf.'s Rule 7.1 Response, admitting facts].)

[34]     (Dkt. No. 149, at ¶¶ 48-78 [Plf.'s Rule 7.1 Response, admitting facts].)

Hutchinson and Dehimer. (Dkt. No. 150, at 9, n.1 [attaching page "3" of Plf.'s Opp'n Memo. of Law].) As a result, these claims are dismissed.

### v.    Stemen

With regard to Defendant Stemen (a nurse practitioner), her involvement in Amir's inpatient treatment at CNY Psychiatric Center was the following: (1) completing an Inpatient Screening Admission Note regarding Amir on August 31, 2009, in which she diagnosed him with "Major Depressive Disorder, Single Episode, Severe With Psychotic Features," "Polysubstance Dependence" and "Antisocial Personality Disorder"; (2) initially prescribing him Risperdal, an anti-psychotic medication and mood stabilizer, and then prescribing him Remeron, an antianxiety antidepressant medication usually improves sleep and appetite; (3) meeting with him for ongoing evaluation and treatment on September 14 and 24, 2009, and October 1, 8, 15, 22, and 27, 2009; (4) completing a Discharge Summary/Service Plan for him on November 2, 2009, in which she revised his diagnosis to "Polysubstance Dependence" and "Borderline Personality Disorder"; and (5) joining Defendant Peroni in writing a Discharge Patient Care Monitoring Note regarding him on October 27, 2009, which, *inter alia*, recommended that ("[o]nce [he] has completed reception" at another correctional facility) Amir be placed in TrICP; and (6) reviewing his Discharge Plan on November 2, 2009.[35]

Plaintiff's claim against Defendant Stemen appears to focus on three asserted errors: (1) she misdiagnosed Amir, especially upon discharge; (2) she misprescribed his medication; and (3)

---

[35]    (Dkt. No. 149, at ¶¶ 90-100 [Plf.'s Rule 7.1 Response, admitting facts]; Dkt. No. 166, Attach. 7 [CNYPC Inpatient Discharge Patient Care Monitoring]; Dkt. No. 166, at 4 [Inpatient Screening Admission Note]; Dkt. No. 166, Attach. 7, at 2 [CNYPC Inpatient Discharge Patient Care Monitoring Note]; Dkt. No. 147, Attach. 87 [attaching pages "35," "45," and "46" of Stemen Depo. Tr.].)

like Defendant Peroni, she knew of his need to be placed in TrICP but willfully failed to follow up on her recommendation that he be placed in TrICP.

For the sake of brevity, the Court will not linger on the fact that Defendant Stemen's initial diagnosis of Amir was expressly noted as being "provision[al]" in nature, and that her revised diagnosis came after weeks of documenting her clinical observation of the absence of symptoms of a major depressive disorder afflicting him. (Dkt. No. 132, Attach. 4, at 374 [Inpatient Screening Admission Note]; Dkt. No. 157, Attach. 1, at 33-34 [Stemen Depo. Tr.]; Dkt. No. 149, at ¶¶ 91-97 [Plf.'s Rule 7.1 Response, admitting facts].) Nor will the Court linger on the fact that Plaintiff's expert did not even expressly opine that Defendant Stemen's change of medications from Risperdal to Remeron in any way deviated from the prevailing standard of care in the community at the time the care was rendered.[36] Nor will the Court repeat (with regard to the last asserted error) the evidentiary defects that the Court identified in its analysis of Plaintiff's Eighth Amendment claim against Defendant Peroni. More important is that, while it appears conceivable that a rational fact finder could conclude that Defendant Stemen acted negligently under the circumstances, no rational fact finder could conclude that she acted with a mental state akin to criminal recklessness. As a result, this claim is dismissed.

### vi.      Sullivan

With regard to Defendant Sullivan (a psychology assistant), her involvement in Amir's outpatient treatment at Downstate C.F. was the following: (1) meeting with Amir upon his admission on November 3, 2009, and creating a record of that meeting on November 5, 2009, in

---

[36]      (Dkt. No. 147, at Attach. 115, at 8 [attaching pages "6" and "7" of Silberg Report].)

which she (a) diagnosed him with "Adjustment Disorder With Mixed Disturbance of Emotions and Conduct," "Alcohol Dependence," "Cannabis Dependence," and "Personality Disorder [Not Otherwise Specified]," and (b) noted that she had "briefly explained to [him] that his [sex] offenses could be reported" (when he expressed a desire to be referred to the SOTP); (2) creating another record on November 6, 2009, in which she (a) recommended individual therapy, (b) made a referral to a psychiatrist, and (c) placed him on continuous observation in the RCTP because he reported thoughts of suicide; (3) seeing him for additional evaluation and psychotherapy on November 13 and 23, 2009, during which she (a) assessed him for warning signs of imminent suicide risk but did not identify such warning signs, and (b) advised him that "his name is on the list for SOTP"; and (4) completing an Outpatient Treatment Plan for him on November 23, 2009, in which she restated her previous diagnosis.[37]

Plaintiff's claim against Defendant Sullivan appears to focus on three asserted errors: (1) she misdiagnosed Amir (just as prior health care providers had done); (2) she failed to evaluate him for placement in (or otherwise facilitate his placement in) TrICP at Downstate C.F.; and (3) she recognized the need for his referral to the SOTP but did not provide any counseling to him regarding his history with sexual abuse.

In analyzing this claim, the Court cannot overlook the fact that Defendant Sullivan essentially rendered the same "incorrect" diagnosis that numerous other health care providers rendered. Moreover, the undisputed evidence is that Defendant Sullivan was unfamiliar with the

---

[37]      (Dkt. No. 149, at ¶¶ 102-106 [Plf.'s Rule 7.1 Response, admitting facts]; Dkt. No. 132, Attach. 4, at 8-9, 71, 126-127, 133-136 [Admission/Screening Note, Screening/Admission Note, Progress Notes, and Outpatient Treatment Plan]; Dkt. No. 166, Attach. 5, at 2 [Screening/Admission Note]; Dkt. No. 166, Attach. 16, at 2 [Progress Note–Single Detail].)

process of placing an inmate in TrICP because TrICP was not available at Downstate C.F. (which was merely a reception facility). (Dkt. No. 147, Attach. 89, at 3-4 [attaching pages "37" and "38" of Sullivan Depo. Tr.].) Finally, it is difficult to understand how helping to cause a referral to the SOTP can render Defendant Sullivan liable under the Eighth Amendment for not herself initiating that treatment before the referral was approved by DOCCS, especially within the relatively brief period of 37 days (i.e., the duration of Amir's stay at Downstate C.F.). Simply stated, while it appears conceivable that a rational fact finder could conclude that Defendant Sullivan acted negligently under the circumstances, no rational fact finder could conclude that she acted with a mental state akin to criminal recklessness. As a result, this claim is dismissed.

### vii.   Bakall

With regard to Defendant Bakall (a physician), his involvement in Amir's outpatient treatment at Downstate C.F. was the following: (1) performing an initial psychiatric evaluation of Amir on November 4, 2009, during which he (a) diagnosed Amir with Polysubstance Dependence and Borderline Personality Disorder "Not Otherwise Specified," (b) performed a suicide risk assessment (finding that warning signs were not present), and (c) ordered Amir to continue his psychiatric medication (Remeron); and (2) meeting Amir for ongoing psychiatric care on November 10 and 24, 2009, during which time he (a) performed suicide risk assessments (finding that the suicide risk was low), (b) continued Amir on his psychiatric medication (Remeron), and (c) stated "Discussed SOTP referral. [Amir] asked for therapy ie pedophilia. SOTP unit chief-Dr. Baker consulted. DOCS will make referral for [treatment]." (Dkt. No. 149, at ¶¶ 107-108 [Plf.'s Rule 7.1 Response, admitting facts]; Dkt. No. 132, Attach. 4, at 90-92 [Initial Psychiatric Evaluation Progress Notes].)

Plaintiff's claim against Defendant Bakall appears to focus on three asserted errors: (1) he misdiagnosed Amir (again, as prior health care providers had done); (2) he failed to evaluate Amir for placement in (or otherwise facilitate his placement in) TrICP at Downstate C.F.; and (3) he recognized the need for Amir's referral to the SOTP but did not provide any counseling to him regarding his history with sexual abuse.

For the same reason that the Court rejected these assigned errors against Defendant Sullivan, the Court rejects them against Defendant Bakall. While it appears conceivable that a rational fact finder could conclude that Defendant Bakall acted negligently under the circumstances, no rational fact finder could conclude that he acted with a mental state akin to criminal recklessness. As a result, this claim is dismissed.

### viii.  Cunningham

With regard to Defendant Cunningham (a licensed master social worker), her involvement in Amir's outpatient treatment at Mid-State C.F. was seeing him on January 26, 2010, when she did the following: (1) reviewed and updated his Core History, in which she, *inter alia*, (a) stated that he "denied suicidal ideation/intent/plan," that he reported "a long history . . . of sexually abusing others," that he reported an act of sexual abuse by his cousin, and that he stated his feeling that he should be in the SOTP, and (b) diagnosed him with Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, Alcohol and Cannabis Dependence, and Personality Disorder Not Otherwise Specified; (2) completed a Comprehensive Suicide Risk Assessment for him, in which she, *inter alia*, (a) stated that he "denies current suicidal ideation/intent/plan," that his warning signs of suicide included his "expression of helplessness/hopelessness," and that he would be "seen monthly, or as needed, for individual

verbal therapy," and (b) repeated her above-described diagnosis; and (3) completed a Progress Note regarding him, in which she, *inter alia*, (a) stated that he was "not currently prescribed medication," that the plan was to "[c]ontinue to monitor [him] off medication," that "[h]is assigned therapist will see him against next month for individual verbal therapy," and that he was "informed on how to contact [OMH] should he need to be seen prior to his next sched[uled] call-out date," and (b) repeated her above-described diagnosis.[38]

Plaintiff's claim against Defendant Cunningham appears to focus on three asserted errors: (1) rendering, or providing inaccurate information that lead to the rendering of, an incorrect diagnosis for Amir (i.e., one other than a severe major depressive disorder with psychotic features); (2) not doing a suicide-risk assessment and interventions according to the appropriate standard of care; and (3) failing to refer him to TrICP, discuss his referral to TrICP, or provide him the same level of care as offered through TrICP.

For the same reason that the Court rejected these assigned errors against Defendants Sullivan and Bakall, the Court rejects them against Defendants Cunningham. To that analysis, the Court would only add the fact that Defendant Cunningham left employment at Mid-State C.F. in February of 2010, diminishing her opportunity to correct her allegedly deficient care and allegedly defective diagnosis. (Dkt. No. 147, Attach. 91, at 7 [attaching page "20" of Cunningham Depo. Tr.].) While it appears conceivable that a rational fact finder could conclude that Defendant Cunningham acted negligently under the circumstances, no rational fact finder could conclude that she acted with a mental state akin to criminal recklessness. As a result, this claim is dismissed.

---

[38] (Dkt. No. 149, at ¶¶ 112-14 [Plf.'s Rule 7.1 Response, admitting facts]; Dkt. No. 132, Attach. 4, at 26-27, 30, 35-36, 149-150 [Core History, Comprehensive Suicide Risk Assessment, and Progress Notes].)

### ix. Porter, Tourtelot and Farago

The Court reaches a different conclusion regarding Plaintiff's claims against Defendant Porter, Tourtelot and Farago.

With regard to Defendant Porter (a licensed master social worker), her involvement in Amir's outpatient treatment at Mid-State C.F. was the following: (1) completing a Treatment Plan Review regarding him upon his admission to SHU on February 17, 2010, in which she, *inter alia*, (a) diagnosed him with Adjustment Disorder with Mixed Disturbances of Emotions and Conduct, Alcohol and Cannabis Dependence, and a Personality Disorder Not Otherwise Specified, and (b) noted that "[h]e denies current suicide ideation intent and/or plan"; (2) completing a Mental Health Assessment regarding him on February 18, 2010; (3) serving as his primary therapist, and completing notes of approximate 86 meetings with him between February 19, 2010, and June 17, 2010, in which she, *inter alia*, indicated an awareness of his chronic suicide risk factors, an assessment of those factors, the provision of 10 psychotherapy sessions, and provision of two referrals to the RCTP; and (4) meeting with him one last time on June 17, 2010, when she, *inter alia*, assessed his mood as "[f]ine," his outward display of emotion as "with the full range [of] affect," and his behavior as under "control during interactions with OMH staff," and she did not identify any "overt psychosis."[39]

Plaintiff's claim against Defendant Porter appears to focus on three asserted errors: (1) not properly examining Amir for risk of suicide; (2) rendering an incorrect diagnosis for him (i.e., one other than a severe major depressive disorder with psychotic features); and (3) failing to place him, or cause him to be placed, in TrICP.

---

[39]     (Dkt. No. 149, at ¶¶ 122-152 [Plf.'s Rule 7.1 Response, admitting facts]; Dkt. No. 132, Attach. 4, at 75-76, 151-162, 177-198, 209-236 [Treatment Plan Review, Mental Health Assessments, and Progress Notes].)

With regard to Defendant Tourtelot (a psychiatric nurse practitioner),[40] her involvement in Amir's outpatient treatment at Mid-State C.F. was the following: (1) participating in a Treatment Plan Review regarding him upon his admission to SHU on February 17, 2010, which, *inter alia*, (a) diagnosed him with Adjustment Disorder with Mixed Disturbances of Emotions and Conduct, Alcohol and Cannabis Dependence, and a Personality Disorder Not Otherwise Specified, and (b) noted that "[h]e denies current suicide ideation intent and/or plan"; (2) first seeing him on February 22, 2010, when she assessed him for the risk of suicide but noted "no acute" signs of such risk; (3) meeting with him for ongoing psychiatric care seven times between March 3, 2010, and June 7, 2010, during which time assessed him for the risk of suicide but noted "no acute" signs of such risk, "no warning signs present," or "no suicide ideation, plan, intent"; and (4) meeting with him one last time on June 17, 2010, when she noted that he "denie[d] any disturbance in mood."[41]

Plaintiff's claim against Defendant Tourtelot appears to focus on four asserted errors: (1) not properly examining Amir for risk of suicide; (2) rendering an incorrect diagnosis for him (i.e., one other than a severe major depressive disorder with psychotic features); (3) failing to place him, or cause him to be placed, in TrICP; and (4) failing to continue his recommended and prescribed psychiatric medication.

---

[40] The last name of this Defendant is identified as "Tortelet" in Plaintiff's Amended Complaint. (*See, e.g.,* Dkt. No. 38, at ¶ 30 [Plf.'s Am. Compl.].)

[41] (Dkt. No. 149, at ¶¶ 153-162 [Plf.'s Rule 7.1 Response, admitting facts]; Dkt. No. 132, Attach. 4, at 75-76, 85, 101-110, 115-121 [Treatment Plan Review and Psychiatric Progress Notes].)

With regard to Defendant Farago (a physician), his involvement in Amir's outpatient treatment at Mid-State C.F. was the following: (1) conducting an Initial Psychiatric Evaluation of him, and completing a Progress Note regarding him, on December 23, 2009, at which time he (a) conducted a Suicide Risk Assessment of him and concluded that "[w]arning signs are not present," (b) diagnosed him with Alcohol and Marijuana Dependence, and "Borderline Personality Disorder with Paranoid/Borderline/Anti-social Traits," and, and (c) noted that his treatment plan included verbal therapy, and (d) discontinued his antidepressant medication (Remeron) without providing a contemporaneously documented rationale for the discontinuance (and without providing, or even considering, any alternative medication); (2) seeing him three more times between January 4, 2010, and February 3, 2010 (but having no further direct interaction with Amir after February 3, 2010); and (3) participating in a Treatment Plan Review regarding him upon his admission to SHU on February 17, 2010, which, *inter alia*, (a) diagnosed him with Adjustment Disorder with Mixed Disturbances of Emotions and Conduct, Alcohol and Cannabis Dependence, and a Personality Disorder Not Otherwise Specified, and (b) noted that "[h]e denies current suicide ideation intent and/or plan."[42]

Plaintiff's claim against Defendant Farago appears to focus on four asserted errors: (1) not properly examining Amir for risk of suicide; (2) rendering an incorrect diagnosis for him (i.e., one other than a severe major depressive disorder with psychotic features); (3) failing to place him, or cause him to be placed, in TrICP; and (4) discontinuing his recommended and prescribed psychiatric medication.

---

[42]     (Dkt. No. 149, at ¶¶ 115, 118-121 [Plf.'s Rule 7.1 Response, admitting facts]; Dkt. No. 132, Attach. 4, at 75-76, 93-100 [Treatment Plan Review, Initial Psychiatric Evaluation, and Progress Notes].)

Admittedly, the issue of whether to dismiss Plaintiff's claims against Defendants Porter, Tourtelot and Farago based on the current record evidence is a close one. Certain of the errors assigned by Plaintiff to these three individuals' conduct, even if true, plainly amount no more than mere negligence. However, after carefully considering the matter, the Court finds that the number and nature of each of these three individuals' medical contacts with Amir, the information learned by each of them about Amir during those contacts, and their respective responses (or non-responses) to that information (especially in light of each of their respective duties and authority) constitute–albeit barely–a sufficient basis on which a rational jury could conclude that each of them knew of and disregarded an excessive risk to Amir's health and safety.

More specifically, the Court finds that the genuine dispute of material fact regarding Plaintiff's claim against Defendant Porter arises from the record evidence indicating the following: (1) that Porter recognized that Amir (a) suffered from a serious mental condition, (b) had a history of sexual abuse (both as an abuser and victim), (c) was a homosexual, and (d) had previously attempted suicide; (2) that, despite these facts, Porter failed to develop Objectives in his Treatment Plan, and apparently failed to provide verbal therapy, that was specifically designed to help him cope with either his history of sexual abuse or his homosexuality; (3) that Porter failed to ask him any more than "some questions" during her numerous visits to him in his cell in SHU; and (4) that Porter failed to indicate certain of Amir's risk factors for suicide (including homosexuality and weight loss).

The Court finds that the genuine dispute of material fact regarding Plaintiff's claim against Defendant Tourtelot arises from the record evidence indicating the following: (1) that

54

Tourtelot recognized that Amir (a) suffered from a serious mental condition, (b) had a history of sexual abuse (both as an abuser and victim), (c) was a homosexual, (d) had previously attempted suicide, (e) had previously been prescribed Remeron, (f) believed he experienced at least some benefit from taking Remeron, (g) wanted psychiatric medication stronger than Remeron, and (h) recently had his Remeron prescription discontinued; (2) that, despite these facts, Tourtelot failed to (a) develop Objectives in his Treatment Plan, and apparently provide verbal therapy, that was specifically designed to help him cope with either his history of sexual abuse or his homosexuality, and (b) prescribe him any psychiatric medication; and (3) that Tourtelot failed to indicate certain of his risk factors for suicide (including weight loss).

Finally, the Court finds that the genuine dispute of material fact regarding Plaintiff's claim against Defendant Farago arises from the record evidence indicating the following: (1) that Farago recognized that Amir (a) suffered from a serious mental condition, (b) believed he experienced at least some benefit from taking Remeron, and (c) wanted psychiatric medication stronger than Remeron; (2) that, despite these facts, Farago discontinued Amir's recommended and prescribed psychiatric medication (Remeron) without providing a contemporaneously documented rationale for the discontinuance, and without providing (or even considering) any alternative medication; (3) that Farago did not provide Amir with verbal therapy to help him cope with his known homosexuality and history of sexual abuse; and (4) that Farago stated "None" in the Suicide Risk Assessment section of his Progress Notes without any explanation (especially in light of various troubling statements made by Amir).

Also a close issue, as pointed out above in note 30 of this Decision and Order, is whether OMH employees are protected, by New York Correction Law § 24, from liability with regard to

Plaintiff's pendent state-law claims. Fortunately, because the AG Defendants did not assert a New York Correction Law § 24 challenge to Plaintiff's pendent state-law claims against those AG Defendants who are OMH employees–including Defendants Porter, Tourtelot and Farago– the Court need not decide that issue. In addition, the Court finds that it is not appropriate, under the circumstances, to decline to exercise supplemental jurisdiction over Plaintiff's pendent state-law claims against Defendants Porter, Tourtelot and Farago under 28 U.S.C. § 1367. As a result, Plaintiff's pendent state-law claims against Defendants Porter, Tourtelot and Farago also survive the AG Defendants' motion for partial summary judgment.

### x.  DeRider, Wiernicki, Holmer and Ward

With regard to Defendants DeRider (a lieutenant), Wiernicki (a lieutenant),[43] Holmer (a captain), Ward (the Deputy Superintendent of Security), their involvement in Amir's disciplinary proceedings at Mid-State C.F. was the following: (1) DeRider served as the Tier II[44] hearing officer during Amir's disciplinary hearings of January 14, February 2, February 5, February 17 and April 26, 2010, when he found Amir guilty of (a) property damage or loss (after which he sentenced Amir to 30 days keeplock confinement), (b) having property in an unauthorized area, smuggling and making an unreported ID change (after which he imposed no keeplock confinement), (c) disobeying a direct order (after which he suspended a penalty of keeplock confinement), (d) again disobeying a direct order (after which he again suspended a penalty of keeplock confinement and reinstated a penalty of 30 days keeplock confinement), and (e)

---

[43]     The last name of this Defendant is identified as "Dubernecki" in Plaintiff's Amended Complaint. (*See, e.g.,* Dkt. No. 38, at ¶ 34 [Plf.'s Am. Compl.].)

[44]     Generally, the three tiers of prison hearings increase in severity (in terms of offenses adjudicated and sentences available) as the tier number ascends. 7 N.Y.C.R.R. § 270.3.

committing violent conduct, creating a disturbance and fighting (after which he sentenced Amir to 23 days keeplock confinement), respectively; (2) Wiernicki served as the Tier II hearing officer during Amir's disciplinary hearing of March 18, 2010, when he found Amir guilty of creating a disturbance and fighting (after which DeRider sentenced Amir to 30 days keeplock confinement and revoked the additional 21-day keeplock penalty against Amir that had been deferred since February 17, 2010); (3) Holmer served as the Tier III hearing officer during Amir's disciplinary proceeding of May 22, 2010, when he found him guilty of disobeying a direct order and committing a movement violation (after which he sentenced Amir to six months in SHU); (4) Ward served as the Tier III hearing officer during Amir's disciplinary hearings of May 14 and June 9, 2010, when he found Amir guilty of two instances of committing an assault on staff and committing an unhygenic act (after which he sentenced Amir to two periods of six months in SHU).[45]

Plaintiff's claims against these four Defendants appear to focus on two asserted errors: (1) Defendants Ward and Wiernicki imposed findings of guilt and disciplinary sentences against Amir without considering his mental health status; and (2) Defendants Holmer and Ward imposed findings of guilt and disciplinary sentences against Amir despite the fact that they received confidential OMH testimony about Amir.

In support of the first asserted error, Plaintiff cites only 7 N.Y.C.R.R. § 253.6. (Dkt. No. 150, at 15 [attaching page "9" of Plf.'s Opp'n Memo. of Law]; Dkt. No. 148, at ¶ 403 [Plf.'s Additional Statement of Facts in Dispute].) However, at most, that regulation indicates that the

---

[45]     (Dkt. No. 149, at ¶¶ 163-176 [Plf.'s Rule 7.1 Response, admitting facts]; Dkt. No. 132, Attach. 3, at 27-28 [Inmate Disciplinary History]. )

Tier II officers *need* not consider an inmate's mental health status, not that they *may* not consider it. *See* 7 N.Y.C.R.R. § 253.6 ("Method of Determination. . . . The inmate shall be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals. The entire hearing must be electronically recorded. . . . The inmate, when present, may reply orally to the charge and/or evidence and shall be allowed to submit relevant documentary evidence or written statements on his behalf."). Even assuming that Wiernicki and DeRider did not consider Amir's mental health status, Plaintiff has pointed to no controlling case law requiring such consideration under the Eighth Amendment during a Tier II hearing (especially one in which neither the inmate nor his legal assistant appears to have requested such consideration).[46]

In support of the second asserted error, Plaintiff cites only Amir's Inmate Disciplinary History. (Dkt. No. 150, at 15 [attaching page "9" of Plf.'s Opp'n Memo. of Law]; Dkt. No. 148, at ¶¶ 230, 231, 243 [Plf.'s Additional Statement of Facts in Dispute].) For the sake of brevity, the Court will not linger on the fact that this document does not indicate what evidence was considered, or how it was considered, at Plaintiff's disciplinary hearings. (Dkt. No. 132, Attach. 3, at 27-28 [Inmate Disciplinary History].) More important is the fact that Plaintiff has pointed to no admissible evidence establishing that either Holmer or Ward abused his discretion in rendering a finding of guilt and a disciplinary sentence based on his consideration of Amir's mental health status. (Dkt. No. 150, at 15 [attaching page "9" of Plf.'s Opp'n Memo. of Law].) The Court notes that, according to Plaintiff, Amir's mental health condition was deliberately being downplayed by Defendants Porter, Tourtelot and Farago, leaving a rational fact finder to

---

[46]        *See, infra,* note 47 of this Decision and Order.

wonder how a consultation with such individuals (or their records) could have possibly rendered Holmer and Ward (both non-mental health specialists) liable for underestimating that mental health condition. Even if Holmer and Ward somehow committed an abuse of discretion, Plaintiff has pointed to no controlling case law holding that any such abuse (which would appear to be a violation of a *state* regulation) rises to the level of a violation of the federal Constitution, which requires Holmer and Ward to have been "*aware* of [Amir's] medical situation and needs," and *deliberately* indifferent "to the severe pain and potentially long-lasting injury [their] acts would cause [him]." *Mahone v. City of New York*, 13-CV-8014, 2014 WL 1407702, at *5 (S.D.N.Y. Apr. 11, 2014) (emphasis added).[47]

      As a result, these claims are dismissed.

---

[47]    The Court notes that any awareness by these Defendants of the April 2007 Private Settlement Agreement ("PSA") in the action of *Disability Advocates, Inc. v. NYS OMH*, 02-CV-4002 (S.D.N.Y.), does not confer on them an awareness of Amir's medical situation and needs, or elevate any indifference exhibited by them to the level of deliberateness. Plaintiff has pointed to no evidence that any of them knew he was somehow violating the PSA by convicting and sentencing Amir. (Dkt. No. 147, Attach. 98, at 5-8 [attaching pages "41" through "44" of DeRider Depo. Tr.]; Dkt. No. 147, Attach. 100, at 3-4 [attaching pages "65" and "66" of Holmer Depo. Tr.].) Nor has Plaintiff even pointed to any provision of the PSA that was actually violated by these Defendants. (Dkt. No. 147, Attach. 84 [PSA].) Generally, the PSA did the following, in pertinent part: (1) it required the "offer[ing]" of "at least 2 hours of structured out-of-cell therapeutic programming and/or mental health treatment per day, five days a week . . . to all inmates subject to a confinement sanction in . . . SHU [of more than 30 days] who meet [specified] diagnostic criteria" such as "*Major* Depressive Disorders"; (2) it stated that "OMH will *continue* to provide input and recommendations in disciplinary proceedings" and that "[t]he written statement of the disposition of the charges, if any, shall reflect how the inmate's mental condition . . . was considered *in accordance with current procedures*"; (3) it provided that, while there was a "presumption" against pursuing charges of destruction of State property, it applied only when those charges were related to charges for self-harming behavior and threats of self-harming behavior; and (4) it stated that it contained no admissions of liability and intended no precedential effect (regarding any of the claims asserted in the plaintiff's complaint). (*Id*. at 7-9, 17-18, 33 [attaching pages "2," "3," "4," "12," "13," and "28," of PSA] [emphasis added].)

### xi.     Extraction Team

With regard to the members of the team that extracted Amir from his cell at Mid-State C.F. on June 18, 2010–Defendants Kane, Dischiavo, Buckbee, Johnson, Lashway, Evans, Husnay, Tedesco and Norwich (all correctional officers or supervisors)–their involvement in Amir's cell extraction was the following: (1) at approximately 8:20 a.m., Amir was directed to prepare to leave Midstate C.F. as part of a transfer; (2) at approximately 8:37 a.m., he refused to leave his cell for the transfer; (3) he was then interviewed by the executive team, ministerial services, mental health services, and the Crisis Intervention Unit, but he still refused to leave his cell; (4) the facility superintendent (Hulihan) authorized the cell extraction and use of pepper spray; (5) at approximately 10:20 a.m., Defendants administered three applications of pepper spray into Amir's cell through the feed-up hatch (each application consisting of two one-second bursts), repeating the order to comply and waiting sufficient time to elapse before each application; (6) after the third application, Amir agreed to comply and backed up to the feed-up door to be handcuffed; (7) Defendants used a retention strap to ensure compliance, escorted him to the shower area for decontamination, then performed a strip frisk without incident; (8) the extraction took approximately four minutes and the shower took approximately four minutes); (9) during the extraction and shower, Amir did not speak; and (10) after the extraction and shower, Amir was seen by a nurse, who reported no injury.[48]

Plaintiff's claims against these nine Defendants appear to focus on their performing the cell extraction despite (allegedly) recognizing Amir's need for emergency psychiatric care.

---

[48]     (Dkt. No. 149, at ¶¶ 177-82 [Plf.'s Rule 7.1 Response, admitting facts]; Dkt. No. 147, Attach. 79 [Video of Cell Extraction].)

Plaintiff bases this alleged recognition on the following facts: (1) the fact that they all received suicide prevention training in which they learned how to identify the risk factors for suicide (and Kane was a course instructor); (2) the fact that they observed several of these factors (e.g., Amir's attempt to isolate himself under a blanket in SHU and risk receiving a disciplinary ticket in order to avoid being transferred to a more-secure facility), and (3) the fact that Defendant Dischiavro knew Amir was a mental health patient and indeed knew his "MHSL" (his Mental Health Service Level).

As an initial matter, it is not clear from the record that all nine Defendants actually *knew* each of the facts listed by Plaintiff. For example, Plaintiff does not attach excerpts of the transcripts of the depositions of Buckbee, Johnson and Tedesco. (*See generally* Dkt. No. 147.) Furthermore, the attached excerpts of the transcripts of the depositions of Kane, Dischiavro, Lashway, Evans, Husnay and Norwich do not actually establish that they knew of Amir's attempted "isolation" under a blanket, and only Dischiavo knew (during the extraction) that Amir was being transferred to a more-secure facility. (Dkt. No. 147, Attach. 101 [Kane Depo. Tr.]; Dkt. No. 147, Attach. 102 [Dischiavro Depo. Tr.]; Dkt. No. 147, Attach. 105 [Lashway Depo. Tr.]; Dkt. No. 147, Attach. 106 [Evans Depo. Tr.]; Dkt. No. 147, Attach. 103 [Husnay Depo. Tr.]; Dkt. No. 147, Attach. 104 [Norwich Depo. Tr.].)

Even if the nine Defendants knew the facts, there is no admissible evidence that they actually drew the inference from those facts that Amir was at a substantial risk for suicide. The Court notes that the training referenced by Plaintiff (which was given to *non*-mental health care providers) consisted of (1) an eight-hour course (only one of the 10 subjects of which regarded "screening for suicide risk") completed before an assignment to a new facility (the number of

61

such assignments, if any, being unclear), and (2) a one-hour class (only one of the four or more subjects of which regarded "risk factors in the evaluation of suicidal potential") required to be received annually. (Dkt. No. 147, Attach. 73, at 3-4 [DOCCS Directive 4101]; Dkt. No. 147, Attach. 74 [Training Materials]; Dkt. No. 147, Attach. 75 [Training Materials].) The Court notes also that (1) at least three of the nine Defendants (Dischiavro, Lashway, and Husnay) knew that Plaintiff had just been interviewed by mental health services and the Crisis Intervention Unit, and (2) all nine Defendants knew that Mental Health Unit Social Worker Davis (who was present during the extraction) was expressing no concern. (Dkt. No. 147, Attach. 102 [Dischiavro Depo. Tr.]; Dkt. No. 147, Attach. 105 [Lashway Depo. Tr.]; Dkt. No. 147, Attach. 103 [Husnay Depo. Tr.]; Dkt. No. 147, Attach. 79 [Video of Cell Extraction].) Moreover, the MHSL known by Dischiavro was only "2," used for inmates who are "[d]iagnosed with a Major/Serious Mental Illness without active symptoms and/or requiring active treatment where patient is compliant for a period of 1 year or more and has shown at least 6 months of psychiatric stability." (Dkt. No. 147, Attach. 102, at 5 [attaching page "40" of Dischiavro Depo. Tr.]; Dkt. No. 166, Attach. 53 [Treatment Needs Form].)

Finally, there is no admissible evidence that any indifference was deliberate. The "laughing" by a "correctional officer" that Plaintiff references on the video is actually a soft chuckle that lasted less than a second, both the origin and object of which are completely speculative. (Dkt. No. 147, Attach. 79 [Video of Cell Extraction].) To the contrary, the Court has carefully reviewed the video of the extraction and is impressed by the officers' professionalism, respectfulness and extreme carefulness, as well as Amir's compliant nature (after he backed up to his cell door). (*Id.*) When viewed in its totality, the video does not

constitute evidence of the sort of wantonness present during deliberate indifference to a serious medical need.

Simply stated, while it appears conceivable that a rational fact finder could conclude that these nine Defendants acted negligently under the circumstances, no rational fact finder could conclude that they acted with a mental state akin to criminal recklessness. As a result, these claims are dismissed.

### xii. Kilburn

With regard to Defendant Kilburn (a sergeant), his involvement in during Amir's reception at Great Meadow C.F. on June 18, 2010, was the following: (1) before seeing Amir, Kilburn had been told that Amir had recently been extracted from his cell, but was not specifically aware of when or at what facility; (2) at approximately 2:36 p.m., he conducted a suicide prevention screening interview of Amir and completed the Suicide Prevention Screening Guideline–SHU Admission Form; (3) on the form, Kilburn reported that he did not "observe [in Amir] bizzare behavior or behavior that may be a sign of suicide risk"; (4) during the interview, Amir answered "yes" to the questions "Have you served SHU time before" and "Have you been seen by Mental Health Staff while incarcerated?"; (5) however, Amir responded "no" to the questions "Are you currently an active mental health patient?", "Have you tried to commit suicide while incarcerated?", "Are you feeling suicidal?", "Do you feel that you cannot adjust to SHU confinement?", and "Are you currently taking any mental health medications?"; (6) after Amir responded "Yes" to the question "Do you feel there is nothing to look forward to in the future?" Kilburn thought Amir did not understand the question, causing him to ask "[Do] you . . . really feel you have nothing to look forward to in the future?", to which Amir responded, "Yes, I

do," which Kilburn interpreted to mean that Amir felt that he *did* have something to look forward to in the future, especially given that Amir was not "acting up," and he was no more "nervous" than such SHU admittees "always" were, in Kilburn's experience; (7) at the bottom of the form, Kilburn checked the box marked for a "Regular Referral" to "Mental Health"; and (8) after Kilburn completed the form, he told the console officer to tell the mental health unit that he would like Amir to be seen by them, "just to double check"; and (9) at approximately 2:48 p.m., Nurse Stevens conducted a Special Housing Admission screening of Amir.[49]

Plaintiff's claim against Defendant Kilburn appears to focus on his failure to make an "immediate" referral of Amir to OMH (rather than the "regular" referral he made as a precaution) after twice receiving an affirmative response to the question "Do you feel there is nothing to look forward to in the future?"

The Court finds the case relied on by Plaintiff–*Sinkov v. AmeriCor, Inc.*, 419 F. App'x 86, 89 (2d Cir. 2011) (holding that a jury could reasonably conclude that defendant "actually knew about [decedent's] risk of suicide" because decedent answered "yes" to *ten* questions on a "suicide screening form at intake" sufficient to "trigger constant monitoring")–to be distinguishable in three respects: (1) at most, Amir responded "yes" to only three of the boxes on the suicide screening form; (2) indeed, Amir expressly answered "no" to the question "Are you feeling suicidal?"; and (3) in any event, further monitoring *was* recommended by Kilburn as a precaution (and initiated approximately 12 minutes later). The Court notes that, after Amir's

---

[49] (Dkt. No. 149, at ¶¶ 185-187 [Plf.'s Rule 7.1 Response, admitting facts]; Dkt. No. 38, Attach. 4, at 109 [Suicide Prevention Screening Guideline–SHU Admission Form]; Dkt. No. 38, Attach. 4, at 108 [Interdepartmental Communication]; Dkt. No. 130, Attach. 23, at 1 [Special Housing Admission Form]; Dkt. No. 132, Attach. 13, at 42-44, 46-54, 67-69 [attaching pages "42" through "44," "46" through "54," and "67" through "69" of Kilburn Depo. Tr.].)

response to Kilburn's follow-up question, Kilburn stated, "That's not how you just answered the question," to which statement Amir did not respond (indicating his assent to Kilburn's interpretation of his response). (Dkt. No. 132, Attach. 13, at 53-54 [attaching pages "53" and "54" of Kilburn Depo. Tr.].)

While it appears conceivable that a rational fact finder could conclude that Defendant Kilburn acted negligently under the circumstances, no rational fact finder could conclude that he acted with a mental state akin to criminal recklessness. As a result, this claim is dismissed.

### xiii.    John and Jane Does

Finally, with regard to the John and Jane Doe Defendants, their involvement in the Eighth Amendment violation claimed is implausibly alleged and speculative in nature. Moreover, Plaintiff has failed to identify these individuals despite having been given a sufficient opportunity in which to do so. (Dkt. No. 125 [rescheduling discovery deadline as March 11, 2014].) As a result, these claims are dismissed.

### b.    The AG Defendants' Second Argument

With regard to the AG Defendants' second argument (i.e., that the supervisory AG Defendants were not personally involved in Amir's care and treatment), the Court finds that as follows.

With regard to supervisory Defendant Kelly, his sole involvement in the claims giving rise to this action was as the superintendent of Great Meadow C.F.[50] Plaintiff does not oppose the entry of summary judgment on her inadequate-medical-care claim against Defendant Kelly.

---

[50]    (*See generally* Dkt. No. 132, Attach. 1 [AG Defs.' Rule 7.1 Statement]; Dkt. No. 149 [Plf.'s Rule 7.1 Response]; Dkt. No. 148 [Plf.'s Statement of Material Facts].)

(Dkt. No. 150, at 9, n.1 [attaching page "3" of Plf.'s Opp'n Memo. of Law].) As a result, this claim is dismissed.

With regard to the remaining three supervisory Defendants–Hogan, Fischer and Hulihan–their involvement in Amir's care and treatment was the following: (1) Hogan was the OMH Commissioner during the time in question and, while he did not have any direct contact with Amir, he was the superior of OMH employees who did have direct contact with Amir; (2) Fisher was the DOCCS Commissioner during the time in question and, while he did not have any direct contact with Amir, he was the superior of DOCCS employees who did have direct contact with Amir; and (3) Hulihan was the Mid-state C.F. Superintendent during the time in question and, while he did not have any direct contact with Amir, he was the superior of Mid-State C.F. employees who did have direct contact with Amir.

Plaintiff's claims against Defendants Hogan, Fischer and Hulihan appear to focus on their (asserted) creation, continuation and/or enforcement of a policy or custom under which unconstitutional practices occurred, specifically a policy or custom of incarcerating mentally ill inmates in SHU without providing them with adequate mental health treatment, despite knowing that such an incarceration had a debilitating effect on the inmates' psychiatric well-being.

As an initial matter, except possibly with regard to Defendants Porter, Tourtelot and Farago, there was no underlying constitutional violation committed in which Defendants Hogan, Fischer and Hulihan could have been personally involved. Furthermore, the alleged violations of Defendants Porter, Tourtelot and Farago regarded various asserted failures and/or omissions that can hardly be characterized as the result of *following* policies or customs. For example, Plaintiff argues that Farago violated procedure by (1) not documenting his rationale for discontinuing

66

Plaintiff's Remeron prescription, and (2) "falsif[ying] . . . paperwork" regarding a visit with Amir that never took place on January 15, 2010.  (Dkt. No. 150, at 28 [attaching pages "22" through "24" of Plf.'s Opp'n Memo. of Law].)

In any event, the asserted personal involvement of Defendants Hogan, Fischer and Hulihan in the constitutional violations allegedly committed by the AG Defendants relies, at its core, on the current regulatory framework governing how correctional employees are to perform the arduous and sometimes dangerous duty of maintaining custody and control of convicted felons who may or may not be afflicted with mental illness in correctional facilities (some of which are maximum-security facilities).  For the sake of brevity, the Court will not linger on its reluctance to second-guess and micro-manage administrators' operation of state correctional facilities, especially with regard to security and medical issues such as (1) what particular evidence a hearing officer *must* obtain and consider before convicting an inmate of a mid-level (Tier II) offense and sentencing him to 30-days keeplock confinement, and (2) whether mental health treatment *must* be provided to inmates in SHU inmates outside of their cell (rather than sometimes through their cell door, in the discretion of the health care provider).  More important is that, in the Court's view, the asserted flaws in the current regulatory framework simply do not rise to the level of a constitutional violation.  The Court notes that there is a lack of admissible record evidence establishing any violation of the PSA from the action of *Disability Advocates, Inc. v. NYS OMH*, 02-CV-4002 (S.D.N.Y.), which in any event was not a Consent Judgment. *See, supra*, note 47 of this Decision and Order.  The Court notes also that, as once observed by the Second Circuit,

[T]he State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. . . . [T]he objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution. . . . The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves . . . .

*Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986) [internal quotations and citations omitted].

### c.    The AG Defendants' Third Argument

With regard to the AG Defendants' third argument (i.e., that the AG Defendants are protected from liability as a matter of law by the doctrine of qualified immunity), the Court finds that, while this doctrine serves as an alternative ground for the dismissal of Plaintiff's claims against most of the AG Defendants (specifically, those AG Defendants against whom Plaintiff's claims were dismissed above in Parts III.E.2.a. and III.E.2.b. of this Decision and Order), the doctrine does not serve as a ground for the dismissal of Plaintiff's claims against the three remaining AG Defendants (specifically, Porter, Tourtelot and Farago)–at least not based on the current record.

### d.    The AG Defendants' Fourth Argument

With regard to the AG Defendants' fourth argument (i.e., that Plaintiff's pendent state-law claims should be dismissed pursuant to New York Correction Law § 24 and 28 U.S.C. § 1367), the Court notes that Plaintiff does not bother responding to this argument, thereby lightening the AG Defendants' burden with regard it to one of facial merit,[51] which the AG Defendants' have

---

[51]    *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met to demonstrate entitlement to the relief

met (except with regard to Plaintiff's pendent state-law claims against Defendants Porter, Tourtelot and Farago).

As a result, Plaintiff's pendent state-law claims against the DOCCS employees (i.e., Defendants Fischer, Hogan, Hulihan, Kelly, DeRider, Wiernecki, Ward, Holmer, Kane, Dischiavo, Buckbee, Johnson, Lashway, Evans, Husnay, Tedesco, Norwich and Savitsky) are dismissed with prejudice as barred by New York Correction Law § 24: all of the claims arise from failures that were performed by the DOCCS employees within the scope of their employment or in the discharge of their duties.[52]

Finally, Plaintiff's pendent state-law claims against the ten of the thirteen OMH employees (i.e., Defendants DeHimer, Hunter, Hutchinson, Nelson, Peroni, Stemen, Bakall, Sullivan, Cunningham and Dill-Lewis) are dismissed without prejudice to refiling in state court in accordance with to 28 U.S.C. § 1367(d), because they (1) are unaccompanied by any surviving federal claim against those particular OMH employees, (2) substantially predominate over (and

---

requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); Este-Green v. Astrue, 09-CV-0722, 2009 WL2473509, at *2 & nn. 2, 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

[52]     In the alternative, the Court finds that Plaintiff's failure to respond to this argument has effectively rendered her pendent state-law claims against the above-referenced DOCCS employees abandoned (regardless of the facial merit of the unresponded-to argument). *See Jackson v. Fed. Exp.*, No. 12-1475, 2014 WL 4412333, at *6 (2d Cir.2014) ("Where a partial response to a motion is made–i.e., referencing some claims or defenses but not others–a distinction between *pro se* and counseled responses is appropriate. In the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. In contrast, in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned. In all cases in which summary judgment is granted, the district court must provide an explanation sufficient to allow appellate review. This explanation should, where appropriate, include a finding of abandonment of undefended claims or defenses.").

are sufficiently distinct from) Plaintiff's surviving federal claims against Defendants Porter, Tourtelot and Farago, and (3) raise a complex issue of state law.[53] However, as stated above in Part III.E.2.a.ix. of this Decision and Order, Plaintiff's pendent state-law claims against the three remaining OMH employees (i.e., Defendants Porter, Tourtelot and Farago) survive the AG Defendants' motion for partial summary judgment.

**ACCORDINGLY**, it is

**ORDERED** that the AG Defendants' motion to dismiss the Third and Fourth Claims of Plaintiff's Amended Complaint for failure to state a claim upon which relief can be granted (Dkt. No. 85) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Defendant Zoe Kingsley's motion for summary judgment (Dkt. No. 130) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Defendant Lewis Richard Davis' motion for summary judgment (Dkt. No. 134) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's motion *in limine* (Dkt. No. 146) is **<u>GRANTED</u>** in accordance with Part III.D.2 above; and it is further

**ORDERED** that the AG Defendants' motion for partial summary judgment (Dkt. No. 132) is **<u>GRANTED</u> in part** and **<u>DENIED</u> in part**; and it is further

**ORDERED** that all of Plaintiff's federal claims in this action are **<u>DISMISSED</u>**, **except** Plaintiff's claims of deliberate indifference to a serious medical need under the Eighth Amendment against Defendants Porter, Tourtelot and Farago, which **<u>SURVIVE</u>** the AG Defendants' motion for partial summary judgment; and it is further

---

[53]     *See, supra,* note 30 of this Decision and Order.

**ORDERED** that also **<u>SURVIVING</u>** the AG Defendants' motion for partial summary judgment are Plaintiff's pendent state-law claims against Defendants Porter, Tourtelot and Farago; and it is further

**ORDERED** that Plaintiff's remaining pendent state-law claims are **<u>DISMISSED</u>**–her pendent state-law claims against Defendants Kingsley, Fischer, Hogan, Hulihan, Kelly, DeRider, Wiernecki (a/k/a Dubernecki), Ward, Holmer, Kane, Dischiavo, Buckbee, Johnson, Lashway, Evans, Husnay, Tedesco, Norwich and Savitsky being **dismissed with prejudice** pursuant to New York Correction Law § 24, and her pendent state-law claims against Defendants DeHimer, Hunter, Hutchinson, Nelson, Peroni, Stemen, Bakall, Sullivan, Cunningham, Dill-Lewis, Kilburn and John and Jane Does being **dismissed without prejudice** to filing in state court in accordance with 28 U.S.C. § 1367(d); and it is further

**ORDERED** that counsel are directed to appear for a pretrial conference on 4/8/15 at 11:00 am before the undersigned in chambers, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than 3/18/15, and the parties are directed to engage in meaningful settlement negotiations prior to the conference. In the event that counsel feel settlement is unlikely, counsel may request to participate via telephone conference for the limited purpose of scheduling a trial date by electronically filing a letter request at least one week prior to the scheduled conference.

Dated: March 3, 2015
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge